## EAGLE INSURANCE COMPANY *v.* OHIO.

### ERROR TO THE SUPREME COURT OF THE STATE OF OHIO.

No. 1051.　Argued April 20, 1894. — Decided May 14, 1894.

A state statute, requiring insurance companies to make full and specified returns to the proper state officers of their business condition, liabilities, losses, premiums, taxes, dividends, expenses, etc., is an exercise of the police power of the State, and may be enforced against a company organized under a special charter from the legislature of the State, which does not in terms require it to make such return, without thereby depriving it of any of its rights under the Constitution of the United States.

THE Insurance Company, plaintiff in error, was incorporated on March 22, 1850, by an act of the General Assembly of Ohio,[1] 48 Ohio Laws, 498. Sections 3654 and 3655 of the Revised Statutes of Ohio read as follows:

---

" [1] AN ACT TO INCORPORATE THE EAGLE INSURANCE COMPANY OF CINCINNATI.

" SEC. 1. *Be it enacted by the General Assembly of the State of Ohio,* That George Crawford, Timothy Griffith, Isaac C. Copelen, William Wood, Henry

" Sec. 3654. The president or vice-president and secretary of each insurance company organized under any law of this

Kessler, Henry Brachman, George M. Herincourt, and the subscribers of the stock of this association and their successors, shall be and are hereby declared to be a body politic and corporate, by the name and style of the Eagle Insurance Company of Cincinnati, and in that name shall be capable, in law, to sue and be sued, plead and be impleaded, answer and be answered, defend and be defended, in all courts of law and equity and elsewhere, with full authority to acquire, hold, possess, occupy, and enjoy, and the same to sell, convey, and dispose of all such real estate as shall be necessary and convenient for the transaction of its business, or which may be conveyed in said company for the security or in payment of any debt which may become due and owing to the same, or in satisfaction of any judgment of a court of law, or any order or decree of a court of equity in their favor, and to make and use a common seal, and the same to alter and renew at pleasure, and generally to do and perform all things relative to the object of this association.

" Sec. 2. That the capital stock of this company shall be one hundred thousand dollars, which may be increased at the pleasure of the majority of the stockholders to two hundred thousand dollars, divided into shares of one hundred dollars each; at the time of subscribing there shall be paid on each share, twenty-five dollars, and the balance on each share shall be subject to the call of the directors, and shall be secured by endorsed notes payable on demand, or other property or stocks, to be approved by the board of directors. Moreover, if at any time the directors shall deem any such security insufficient, it shall be their duty to require additional security on such notes or obligations by them held for the payment of stocks as they shall deem best; and any stockholder failing to pay at the time and in the manner prescribed by the board, any portion of their stock remaining unpaid, or shall fail, neglect or refuse to give such additional securities as may be required of them, it shall be the duty of the directors to sell such delinquent share or shares at auction for cash to the highest bidder, after having given ten days' public notice of the time and place of sale, and the proceeds to be applied in payment of said shares; and, moreover, such delinquent stockholder shall be held liable in his individual capacity for any balance remaining unpaid on said shares, and in case any excess shall arise from such sale after having paid up the delinquency and expenses of such sale, such excess shall be paid to said stockholder.

" Sec. 3. That so soon as four hundred shares are subscribed for and paid, or secured to be paid, as required in the second section of this act, the company shall be competent to transact all kinds of business for which it was established.

" Sec. 4. That the affairs of the company shall be managed by seven directors, all of whom shall be stockholders, to be elected as follows: A

State shall, annually, on the first day of January, or within thirty days thereafter, prepare, under oath, and deposit in the

---

majority of the stockholders composing this association, shall hold a meeting for the first election of directors within one month after the amount of four hundred shares of stock shall be subscribed, and on the first Monday in May in each and every year thereafter, and choose by ballot seven directors, who shall be stockholders, and each share of stock shall entitle the holder thereof to one vote, and the directors so chosen shall serve to the first Monday in May, 1851, and until others are chosen. At their first meeting after every election, they shall choose by ballot a president from their own number, and in case of the death or disability of the president thus chosen, the directors shall fill the vacancy by ballot as before, and in case of a vacancy in the board of directors, it shall be filled by the remaining directors from the stockholders for the remainder of the year, and the board of directors thus constituted, or a majority of them, when convened at the office of the company, shall be competent to exercise all the powers vested in the board by this act.

"SEC. 5. That it shall be lawful for said company to insure all kinds of property against loss or damage by fire or any other cause or risk, in and out of the State; to make all kinds of insurance on goods, merchandise, or other property in the course of transportation, whether on land or water, or any vessel or boats wherever they may be, to lend money upon bottomry or respondentia to cause themselves to be insured against any loss or risk they may have incurred in the course of their business, and against any maritime or other risks, upon the interest which they may have in any vessel, boat, goods, or merchandise, or other property, by means of any loan or loans which they may make on mortgage, bottomry, or respondentia, and generally to do and perform all other matters and things connected with and proper to promote these objects.

"SEC. 6. It shall be lawful for said company to invest all or any part of their capital stock, money, funds, or other property, in such a way as the directors shall deem best for the safety of the capital and interest of the stockholders, and may transfer, sell, and dispose of any or all interest which the said company may have acquired by said investment, provided that it shall not be lawful for said corporation to use or employ any part of their capital stock, money, or other funds in buying or selling goods, wares, or merchandise, nor in the purchase of real estate, except as provided in the first section of this act, nor shall the said company trade in the business of exchange brokerage, nor issue or emit any bills of credit as a circulating medium of trade or exchange, or in any manner engage in the business or operation of banking.

"SEC. 7. That the president and directors shall declare such dividends of the profits of the business of the company as shall not impair nor in anywise lessen the capital stock of the same. The dividends shall be made half yearly, on the first Monday in January and July, and shall be paid to

office of the superintendent of insurance, a statement of the condition of such company on the thirty-first day of Decem-

---

the stockholders ten days thereafter, but no dividends shall be paid to any stockholder whose stock is delinquent.

" SEC. 8. The transfers of stock may be made by any stockholder or his legal representative, subject to such restrictions as the board of directors shall from time to time make and establish.

" SEC. 9. That all policies or contracts of insurance that may be made or entered into by the said company, may be made either under or without the seal thereof, and shall be subscribed by the president or by such other officer as may be designated for that purpose by the board of directors, and attested by the secretary, and being so subscribed and attested shall be obligatory upon the said company according to the tenor, intent, and meaning of this act, and of such policies or contracts, and all such policies or contracts so made, subscribed, attested, and executed, and the loans and other business of the company may be made, conducted, and carried on without the presence of the whole of the directors, but by such committee or otherwise as the board may authorize, and the same shall be binding on the company.

" SEC. 10. That the individuals named in the first section of this act, or such committee as they shall appoint, shall receive the subscriptions to the capital stock of this company, and open books for that purpose at the city of Cincinnati aforesaid, upon two weeks' notice published in at least two daily papers of said city, which books shall continue open from day to day for ten days, unless the whole amount of the capital stock shall sooner be subscribed, and shall receive all moneys paid at the time of subscribing to said stock, and hold the same until the election of the first board of directors, when they shall dispose of it as said board may direct.

" SEC. 11. That the president and directors shall have power and authority to appoint a secretary, and such other officers under them as shall be necessary for transacting the business of said institution, and may allow them such salaries as they shall judge reasonable; — to ordain and establish such by-laws and regulations as shall appear to them necessary for regulating and conducting the concerns of said institution, not being contrary to or inconsistent with this act, the constitution or laws of this State, and of the United States; they shall keep full, fair, and correct entries of their transactions, which shall be at all times open to the inspection of the stockholders.

" SEC. 12. That should it so happen from any cause whatsoever that the annual election of directors should not take place in any year on the day hereinbefore mentioned for that purpose, this corporation shall not be for that reason dissolved, but such election may be lawfully held on such other convenient day, within six months thereafter, as may for that purpose be fixed by the president and directors, they causing ten days' notice thereof to be given in one or more of the newspapers printed in the city of Cincinnati.

ber, then next preceding, exhibiting the following facts and items, and in the following form, namely :

"*First* — The amount of the capital stock of the company, specifying the amount paid and unpaid.

"*Second* — The property or assets held by the company, specifying :

"1. The value of the real estate owned by such company, where it is situated, and the value of buildings thereon.

"2. The amount of cash on hand and deposited in banks to the credit of the company, specifying in what banks the same is deposited.

"3. The amount of cash in the hands of agents and in course of transmission.

"4. The amount of loans secured by bonds and mortgages, which are the first lien on real estate, and on which there is less than one year's interest due.

"5. The amount of loans on which interest has not been paid within one year.

"6. The amount due the company on which judgments have been obtained, and the cash value thereof.

"7. The amount of stocks in this State, the United States, of any city of this State, and of any other stocks owned by the company, specifying the amount, number of shares, and the par and market value of each kind of stock.

"8. The amount of stock held as collateral security for loans, with the amount loaned on, and the par and market value of each kind of stock.

"9. The amount of unpaid assessments on stock, premium notes, or contingent liabilities.

"10. The amount of interest due and unpaid, and the amount of interest accrued, but not due.

---

"SEC. 13. That the president and directors may call a general meeting of the stockholders for any purpose relative to the affairs of the company, giving at least ten days' notice thereof in some newspaper printed in Cincinnati.

"BENJAMIN F. LEITER,
"*Speaker of the House of Representatives.*
"CHARLES C. CONVERS,
"MARCH 22, 1850.          "*Speaker of the Senate.*"

" 11. The amount of premium notes or contingent liabilities on which policies are issued.

" 12. The number of policies in force.

" 13. The amount insured under all policies in force.

" 14. The amount of premiums received thereon.

" 15. The amount and a description of all other assets.

" *Third* — The liabilities of the company, specifying :

" 1. The amount of losses due and unpaid.

" 2. The amount of claims for losses resisted by the company.

" 3. The amount of losses incurred during the year, including those claimed and not due, and those reported to the company upon which no action has been taken.

" 4. The amount of dividends declared and due, and remaining unpaid.

" 5. The amount of dividends, either cash or scrip, declared but not due.

" 6. The amount of money borrowed, and the security given for the payment thereof.

" 7. The amount required for re-insurance, being in stock companies a sum equal to fifty per cent of the whole amount of premiums on unexpired risks and policies, and in mutual companies a sum equal to fifty per cent of the cash premiums received on unexpired risks and policies.

" 8. The amount of all other existing claims against the company.

" *Fourth* — The income of the company during the preceding year, specifying :

" 1. The amount of cash premiums received.

" 2. The amount of notes or contingent assets received for premiums.

" 3. The amount of interest money received.

" 4. The amount of income received from other sources.

" *Fifth* — The expenditure during the preceding year, specifying :

" 1. The amount of losses paid during the year, stating how much of the same accrued prior, and how much subsequent to the date of the preceding statement, and the amount at which losses were estimated in each preceding statement.

" 2. The amount of dividends paid during the year.

" 3. The amount of expenses paid during the year, including commissions and fees to agents and officers of the company.

" 4. The amount paid for taxes.

" 5. The amount of all payments and expenditures.

" 6. Amount of scrip dividend declared.

\*        \*        \*        \*        \*

" SEC. 3655. The statement of any such company, the capital of which is composed in whole or in part of notes, shall, in addition to the foregoing, exhibit the amount of notes which originally formed the capital, and also what proportion of such notes is still held by the company and considered capital; and every company organized under any law of this State which fails to make and deposit such statement, or to reply to any inquiry of the superintendent with respect to such statement, shall be subject to a penalty of five hundred dollars, and an additional five hundred dollars for every month that it continues thereafter to transact any business of insurance, to be recovered by action in the name of the State, and, on collection, paid into the state treasury for the benefit of the State Common School fund; and the Attorney General, on the request of the Superintendent of Insurance, shall institute such action against any company so delinquent, in the court of appropriate jurisdiction in Franklin county, or in the court of appropriate jurisdiction of the county in which said company is located or has its principal place of business, as he prefers."

Under these sections proper blanks were furnished to the company by the State Superintendent of Insurance, and on its refusal to make the returns required by law, proceedings by mandamus were begun against it. The defence was that the above provisions impaired the obligation of the contract which grew out of its charter. Upon the decision of the Supreme Court of the State making the writ peremptory, the case was brought here by error.

*Mr. Thomas H. Kelly,* (with whom was *Mr. John F. Follett* on the brief,) for plaintiffs in error.

*Mr. J. K. Richards*, Attorney General of the State of Ohio, filed a brief for defendant in error, but the court declined to hear him.

Mr. Justice White, after stating the case, delivered the opinion of the court.

The only question presented is whether or not the charter of the plaintiff in error exempted it from obligation to comply with the subsequently established police regulations of the State, contained in sections 3654 and 3655 of the Revised Statutes of Ohio. This subject was fully considered by this court in the case of *The Chicago Life Insurance Company* v. *Needles*, 113 U. S. 574: There the company had been chartered by the State of Illinois to carry on a life insurance business, and the question was whether subsequently enacted police regulations of that State for the inspection of such business, and for the liquidation thereof, in the event of insolvency, could be enforced against a corporation working under a prior charter without impairing the obligation of the contract. The statute considered in the *Needles case* authorized the Auditor, whenever the actual funds of any life insurance company doing business in the State were not of a net value equal to the net value of its policies, according to the "combined experience" or "actuaries'" rate of mortality, with interest at four per cent, to give notice to such company and its agent to discontinue issuing policies in the State until such time as its funds should become equal to its liabilities, valuing its policies as aforesaid. The law, in addition, required every life insurance company incorporated in Illinois to transmit to the Auditor on or before the 1st day of March in each year a sworn statement of its business, standing, and affairs, in the form prescribed and authorized by law. It also empowered the officer to address inquiries to any company in relation to its "doings and condition," and any other matter connected with its transactions, which inquiries, it provided, should be "promptly answered;" and it imposed upon him the duty of making an examination of the condi-

tion and affairs of any company, whenever he deemed it expedient to do so, and had reason to suspect the correctness of any annual statement, or that the company was in an unsound condition. By another statute it was provided that if, upon examination of the affairs of any insurance company, the Auditor should conclude that it was insolvent, or that its further continuance in business would be hazardous to the insured or the public, he should apply by petition to the judge of any Circuit Court for an injunction restraining the company from proceeding with its business until further hearing, etc. Upon the case as thus presented the court said :

"The case upon the merits, so far as they involve any question of which this court may take cognizance, is within a very narrow compass. The main proposition of the counsel is that the obligation of the contract which the company had with the State, in its original and amended charter, will be impaired, if that company be held subject to the operation of subsequent statutes regulating the business of life insurance and authorizing the courts, in certain contingencies, to suspend, restrain, or prohibit insurance companies incorporated in Illinois from further continuance in business. This position cannot be sustained consistently with the power which the State has, and, upon every ground of public policy, must always have over corporations of her own creation. Nor is it justified by any reasonable interpretation of the language of the company's charter. The right of the plaintiff in error to exist as a corporation, and its authority, in that capacity, to conduct the particular business for which it was created were granted, subject to the condition that the privileges and franchises conferred upon it should not be abused, or so employed as to defeat the ends for which it was established, and that, when so abused or misemployed, they might be withdrawn or reclaimed by the State in such way and by such modes of procedure as were consistent with law. Although no such condition is expressed in the company's charter, it is necessarily implied in every grant of corporate existence. *Terrett* v. *Taylor*, 9 Cranch, 43, 51; Angell & Ames on Corporations, 9th ed. paragraph 774, note.

"Equally implied, in our judgment, is the condition that the corporation shall be subject to such reasonable regulations, in respect to the general conduct of its affairs, as the legislature may from time to time prescribe, which do not materially interfere with or obstruct the substantial enjoyment of the privileges the State has granted, and serve only to secure the ends for which the corporation was created. *Sinking Fund Cases*, 99 U. S. 68, 70; *Commonwealth* v. *Farmers' & Mechanics' Bank*, 21 Pick. 542; *Commercial Bank* v. *Mississippi*, 4 Sm. & Marsh. 497, 503. If this condition be not necessarily implied, then the creation of corporations, with rights and franchises which do not belong to individual citizens, may become dangerous to the public welfare through the ignorance, or misconduct, or fraud of those to whose management their affairs are entrusted. It would be extraordinary if the legislative department of a government, charged with the duty of enacting such laws as may promote the health, the morals, and the prosperity of the people, might not, when unrestrained by constitutional limitations upon its authority, provide, by reasonable regulations, against the misuse of special corporate privileges which it has granted, and which could not, except by its sanction, express or implied, have been exercised at all."

These views are decisive of the issue here. An attempt is made to distinguish that case from this upon the ground that, in the former, the proceedings were for the purpose of compelling the company to cease from business because of insolvency; while, in this case, the question is as to the obligation of the company to make the statements required by the statute. This distinction is 'without foundation. In the *Needles case*, the duty was expressly imposed upon the corporation to make statements identical in form and substance with those which insurance companies are required to make under the Ohio statute we are here considering. Many additional police powers were conferred by the Illinois law, among them being the authority which, as stated above, was given to the State Auditor to apply for an injunction restraining a company from continuing its business, whenever, by its statement, it appeared to him to be insolvent. It is, indeed,

true that the relief there invoked was the restraint of the corporation from doing business on the ground of insolvency. But that case substantially involved not only the right to compel the statement, but the greater right to prevent, in case of insolvency, the continuance of the business of the corporation. Hence, as the greater includes the less, the *Needles case* necessarily embraces every issue presented here.

Another contention is that compliance with the provisions in regard to statements of its business would bring the company under the operation of the general law of the State relating to corporations, and thus place it in the position of voluntarily subjecting itself to many provisions which would, if applied, impair the obligations of the charter. In March, 1892, (89 Ohio Laws, 73,) the General Assembly of Ohio specifically enacted that any fire insurance company which should comply with the requirements of sections 3654 and 3655, or any other police regulations contained in Chapter XI of the title relating to corporations, and Chapter VIII, Title 3, Part 1, of the Revised Statutes of Ohio, relating to the insurance department of the State, "shall not be deemed to have consented to and shall not be affected by the provisions" of the title relating to corporations.

The judgment of the Supreme Court of Ohio in the case before us expressly finds that, under the operation of this last provision, the plaintiff in error would not subject its charter to any conditions or modifications by making the statement which it now refuses to submit.

*Judgment affirmed.*