# LOUISVILLE & NASHVILLE RAILROAD COMPANY *v.* KENTUCKY.

ERROR TO THE COURT OF APPEALS OF THE STATE OF KENTUCKY.

No. 722. Argued January 14, 15, 1896. — Decided March 30, 1896.

A power given in a charter of a railroad to connect or unite with other roads refers merely to a physical connection of the tracks, and does not authorize the purchase, or even the lease of such roads or road, or any union of franchises.

The several statutes of Kentucky and of Tennessee relating to the Louisville and Nashville Railroad Company, which are quoted from or referred to in the opinion of the court, confer upon that company no general right to purchase other roads, or to consolidate with them.

The union referred to in those statutes is limited to a union with a road already connected with the Louisville and Nashville by running into the same town, and has and could have no possible relation to the acquirement of a parallel or competing line.

The third section of the Kentucky act of 1856 reënacting the Tennessee act of 1855, and providing that the Louisville and Nashville Company may " from time to time extend any branch road and may purchase and hold any road constructed by another company " did not confer a general power to purchase roads constructed by other companies regardless of their relations or connections with the Louisville and Nashville road.

A contemporaneous construction of its charter which ratified the purchase of a few short local lines does not justify the company in consolidating with a parallel and competing line between its two termini with a view of destroying the competition which had previously existed between the two lines.

The Chesapeake, Ohio and Southwestern Railroad Company was never vested with the power to consolidate its capital stock, franchises or property with that of any other company owning a parallel or competing line.

If, from reasons of public policy, a legislature declares that a railway company shall not become the purchaser of a parallel or competing line, the purchase is not the less unlawful, because the parties choose to let it take the form of a judicial sale.

Whatever is contrary to public policy or inimical to the public interests is subject to the police power of the State, and is within legislative control; and, in the exertion of such power, the legislature is vested with a large discretion, which, if exercised *bona fide* for the protection of the public, is beyond the reach of judicial inquiry.

Section 201 of the constitution of the State of Kentucky of 1891, providing that " no railroad, telegraph, telephone, bridge or common carrier company shall consolidate its capital stock, franchises or property, or pool its earnings, in whole or in part, with any other railroad, telegraph, telephone, bridge or common carrier company, owning a parallel or competing line or structure; or acquire, by purchase, lease or otherwise, any parallel or competing line or structure, or operate the same ; nor shall any railroad company or other common carrier combine or make any contract with the owners of any vessel that leaves or makes port in this State, or with any common carrier, by which combination or contract the earnings of the one doing the carrying are to be shared by the other not doing the carrying," is a legitimate exercise of the police power of the State, and forbids the consolidation between the Louisville and Nashville Company and the Chesapeake, Ohio and Southwestern Company, which is the subject of controversy in this suit, at least so far as the power to make it remains unexecuted.

THIS was a bill in equity, styled a petition, originally filed by the Commonwealth of Kentucky against the Louisville and Nashville Railroad Company, (hereinafter called the L. & N. Co.,) the Chesapeake, Ohio and Southwestern Railroad Company (hereinafter called the Chesapeake Co.) and several subordinate corporations tributary to the latter, to enjoin the L. & N. Co. (1) from acquiring the control of, or operating, the parallel and competing lines of railroad known as the Chesapeake, Ohio and Southwestern system; (2) from acquiring or operating the Short Route Railway Transfer Co., a belt line in Louisville, and the Union Depot in Louisville, connected therewith; and also (3) to enjoin the Chesapeake, Ohio and Southwestern system from selling out to or permitting its roads to be operated by its competitor, the L. & N. Co.

It was stated substantially in the Commonwealth's petition, as its cause of action, that the L. & N. Co. owned and controlled many railroads in Kentucky, as respects which, railroads owned or controlled by the other companies named are parallel and competing; that defendants have made a contract and arrangement, whereby the L. & N. Co. is to become the owner, and acquire a control of, the capital stock, franchises and property of the other defendant companies, to the great injury of the Commonwealth, and in violation of section 201 of the state constitution of 1891, which reads as follows:

" SEC. 201. No railroad, telegraph, telephone, bridge or common carrier company shall consolidate its capital stock, franchises or property, or pool its earnings, in whole or in part, with any other railroad, telegraph, telephone, bridge or common carrier company, owning a parallel or competing line or structure; or acquire, by purchase, lease or otherwise, any parallel or competing line or structure, or operate the same; nor shall any railroad company or other common carrier combine or make any contract with the owners of any vessel that leaves or makes port in this State, or with any common carrier, by which combination or contract the earnings of the one doing the carrying are to be shared by the other not doing the carrying."

In an amended petition it was stated in substance that the

L. & N. Co. was endeavoring to acquire the capital stock, interest in real property and mortgage securities of the other defendant companies, in order to obtain control and ultimately purchase at judicial sale and become the owner of, their franchises and property.

The answer denied the allegation in the form as made, but contained an affirmative statement that the purchase of the stock and securities referred to had already been consummated, and in effect admitted that the L. & N. Co. intended to purchase the franchises and properties at judicial sale.

The L. & N. Co. was incorporated by an act of the Kentucky legislature approved March 5, 1850, the fourteenth section of which act provided " that the president and directors of said company are hereby vested with all powers and rights necessary to the construction of a railroad from the city of Louisville to the Tennessee line, in the direction of Nashville, the route, to be by them selected and determined, not exceeding sixty-six feet wide, with as many sets of tracks as they may deem necessary; and that they may cause to be made contracts with others for making said railroad, or any part of it."

This act was frequently amended in details unnecessary to be noticed here, one of which, adopted March 7, 1854, declared (section 4) " that it shall be lawful for said Louisville and Nashville Railroad Company to unite their road with any other road connecting therewith upon such terms and conditions as may be agreed upon between the said Louisville and Nashville Railroad Company and such other company as they may desire to unite their said road with."

On December 15, 1855, the legislature of Tennessee passed an act to amend an act entitled " An act to charter the Louisville and Nashville Railroad Company, and the several acts amending said act passed by the legislatures of Kentucky and Tennessee," (Laws of Kentucky, 1855–6, c. 227,) under which it had been authorized to construct its road in Tennessee from the Kentucky line to Nashville, the thirteenth section of which act provided as follows:

" SEC. 13. *Be it further enacted*, That this act shall take effect from and after its passage: *Provided*, Nothing herein

contained shall be construed to prevent the Louisville and Nashville Railroad Company from admitting branch roads to connect with it at any point or points to be agreed upon between said company and those who have or may subscribe stock for the construction of any branch road. The stock subscribed, and the means created to construct such separate branch, shall be faithfully applied to that purpose; and said company is hereby vested with the power and the right to issue its bonds under the provisions of this act to obtain means to construct and equip any branch road; the bonds to express on their face the purpose for which they were executed; and to secure their payment may execute a deed of trust, or mortgage, for payment of which the rights, credits, profits, property and franchise, procured for said branch by the use of its means, shall alone be made liable. The credit, rights or profits of the main stem shall not be used to create means to construct, or be made liable for any debt or liability created to construct, branch roads; nor shall the rights, credit, property and profits of any branch road be used to create means to construct, or made liable for any debt or liability created to build the main stem; and with a view to such liabilities and profits, said company shall keep separate accounts, exhibiting the stock, property and debts of the main road, and each separate branch."

On January 17, 1856, the legislature of Kentucky passed an act, the *first* section of which reenacted the act passed by the legislature of Tennessee in 1855 "in the following sections and words:" (Here follows a literal copy of the Tennessee act.) The *second* section of this act vested the Louisville and Nashville Company with power to make agreements with any Tennessee corporation to construct a railroad in part or in whole of the distance between Louisville and Memphis, and running in the direction of Louisville, whereby to secure mutual and reciprocal rights to the contracting parties, etc. The *third* section was as follows: "That the said company may, under the provisions of the thirteenth section of this act," (referring evidently to the thirteenth section of the Tennessee act,) "from time to time extend any branch road,

*and may purchase and hold any road constructed by another company,* or may agree on terms to receive the cars of other roads on their said road, but shall charge for the same the usual freight."

At the same session, and on February 14, 1856, (Laws of Kentucky, 1855–6, c. 148,) the legislature of Kentucky passed what is known as the General Reservation Act, the language of which, so far as it is material here, is as follows:

"SEC. 1. That all charters and grants of, or to corporations, or amendments thereof, and all other statutes shall be subject to amendment or repeal at the will of the legislature, unless a contrary intent be therein plainly expressed: *Provided,* That whilst privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested. . . ."

"SEC. 3. That the provisions of this act shall only apply to charters and acts of incorporation to be granted hereafter; and that this act shall take effect from its passage."

At this time and up to September, 1856, the L. & N. Co. owned only a short piece of road — thirty-one miles in length — extending from Louisville, southwardly, to Lebanon Junction. Up to September, 1857, it owned only forty-five miles; to September, 1858, seventy-two miles; in 1859, only one hundred and ten miles; and not till 1860 did it carry its road to Nashville, one hundred and eighty miles. About the same time was constructed a branch road from a point about seven miles south of Bowling Green to the state line, which has since been extended and is now owned and operated by it, to Memphis, Tennessee. Subsequently it purchased and now owns a road known as the Evansville, Henderson and Nashville Railroad, which extends from Edgefield, Tennessee, on its main line ten miles north of Nashville, by way of Hopkinsville, Kentucky, to Henderson, and thence across the Ohio River to Evansville, Indiana. It also owns and operates various branches in the State of Kentucky that diverge from the main line eastwardly, as well as the Kentucky Central Railroad, extending from Cincinnati southward, and certain branches thereof.

Of the roads constituting the Chesapeake, Ohio and Southwestern system, the first one extended from Paducah to Elizabethtown, and was subsequently extended from Cecilia Junction, six miles from Elizabethtown, to Louisville, whereby a continuous line was formed from Louisville to Paducah, independent of the L. & N. road. But by a subsequent lease, amounting practically to a purchase of a road from Paducah to Memphis, the Chesapeake Company became, about 1881, the owner of a connected, continuous and independent railroad from Louisville by way of Cecilia Junction and Paducah to Memphis. It also has an interest in, and control of, several other railroads bearing the name of, and nominally held by, the companies that built them, one of which is termed the Short Route Railway, extending from Preston street in Louisville through the depot at Seventh and Water streets to Twelfth street, where it connects with the main line.

Upon a hearing of the case upon pleadings and proofs, a decree was entered by the Jefferson circuit court in favor of the Commonwealth, enjoining the proposed agreement for consolidation, which decree was subsequently affirmed by tho Court of Appeals of Kentucky. 31 S. W. Rep. 476.

Whereupon the L. & N. Co. sued out a writ of error from this court.

*Mr. Helm Bruce, Mr. Edward Baxter*, and *Mr. James P. Helm* for plaintiff in error.

*Mr. George M. Davie* and *Mr. Alexander P. Humphrey* for defendant in error.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case turns to a certain extent upon the principles just announced in *Pearsall* v. *Great Northern Railway Company, ante,* 646, although it differs from that case in the fact that the charter of the L. & N. Co. contains no reserved power to alter or amend, as well as in several other minor particulars.

1. The original charter of the L. & N. Co., granted in 1850,

was limited in its character, and authorized the company only to construct a railroad from Louisville to the Tennessee line, in the direction of Nashville, with as many tracks as might be deemed necessary, but with no power to extend its lines or to purchase, lease or consolidate with other roads.

By the act of March 7, 1854, the company was given power to *unite* their road with any other road connecting therewith upon such conditions as the two companies might agree upon. As we have frequently held that a power to connect or unite with another road refers merely to a physical connection of the tracks and does not authorize the purchase or even the lease of such road, or any union of their franchises, it is evident that this act is no authority for the proposed consolidation. *Atchison, Topeka &c. Railroad* v. *Denver & New Orleans Railroad,* 110 U. S. 667; *Pennsylvania Co.* v. *St. Louis, Alton &c. Railroad,* 118 U. S. 290 ; *Oregon Railway* y. *Oregonian Railway,* 130 U. S. 1 ; *St. Louis Railroad* v. *Terre Haute Railroad,* 145 U. S. 393; *Commissioners* v. *Railroad Co.,* 50 Indiana, 85, 110. The important power to purchase or consolidate with another line cannot be inferred from any such indefinite language as " to unite or connect with such road." The union referred to in this act is also limited to a union with a road already connected with the L. & N. Co. by running into the same town, and could have no possible relation to the acquirement of a parallel or competing line. We ordinarily speak of two roads as connecting when they have stations in the same city, in which case authority is given by this act to make a mechanical union between the tracks of the two companies.

Appellant relies principally, however, upon the act of January 17, 1856, the first section of which reënacted an act of the legislature of Tennessee, passed the year before, chartering the L. & N. Co., which last mentioned act contained sixteen sections authorizing, among other things, the issue of bonds of the State to aid the company in building a bridge across the Cumberland River, and in purchasing iron, etc. The Kentucky act contained but five sections in all, the third of which provided " that said company may, under the provisions of the thirteenth section of this act, from time to time extend any branch road,

and *may purchase and hold any road constructed by another company*, or may agree on terms to receive the cars of other roads on their said road, but shall charge for the same the usual freight."

The thirteenth section of the Tennessee act, incorporated into the first section of the Kentucky act, also authorized the company to permit branch roads to connect with it at any points to be agreed upon between the company and the stockholders of the branch road.   It also authorized the issue of bonds to obtain the means to construct and equip any branch road, and provided that the credits and profits of the main stem should not be used for such purpose, nor the property and profits of any branch road be used to build the main stem.   As this section, however, was merely limited to *branch* roads, the L. & N. Co. is forced to rely for its authority to acquire the control of the Chesapeake Co. upon its power "to purchase and hold any road constructed by another company."

The Court of Appeals of Kentucky held that the whole section, taken together, indicated that the power to purchase and hold any road constructed by another company referred to *branch* roads, which, by a previous clause of the same section, the L. & N. Co. was authorized to construct, and that this was also further manifested by the power given to "agree on terms to receive the cars of other roads on their said road."

Upon the other hand, the company insists that the power to purchase and hold other roads is not only unlimited and extends to all other roads built or to be built, although parallel and competing lines, but that it constitutes an irrevocable contract, which a subsequent legislature is powerless to impair.

In construing this section we are bound to bear in mind the general rule, so often affirmed by this court, that all doubts with regard to the authority granted in a corporate charter are to be resolved against the corporation, and that a surrender of the power of the legislature in any matter of public concern must never be presumed from uncertain or equivocal expressions.   *Dubuque & Pacific Railroad* v. *Litchfield*, 23 How. 66, 88; *Delaware Railroad Tax*, 18 Wall. 206, 225;

*Bailey* v. *Magwire*, 22 Wall. 215; *Slidell* v. *Grandjean*, 111 U. S. 412; *Belmont Bridge* v. *Wheeling Bridge*, 138 U. S. 287.

At this time (January, 1856) the only railroads in the State of Kentucky in operation were from Louisville, eastwardly to Lexington, and one from Lexington, northwardly by way of Paris, to Covington. There was no road running into southern or western Kentucky, or southwardly from Louisville, except the L. & N. Co.'s road as far as it had gone. While the General Assembly was not only willing but anxious that this company should have liberal and broad powers to aid it, the question of parallel or competing lines had probably not entered into the minds of the legislators as a contingency to be provided against.

There are two reasons why, in our opinion, the third section of the act of 1856 was never intended to confer a general power to purchase roads constructed by other companies, regardless of their relations or connections with the L. & N. road.

(1.) The language of the section is that the "company may, *under the provisions of the thirteenth section of this act*," (referring to the thirteenth section of the Tennessee act, reënacted,) "from time to time extend" by its own construction "any branch road." Now, as before observed, the thirteenth section of the Tennessee act refers only to *branch* roads, the cost of which was to be a charge or mortgage upon the branch line, and not upon the main stem; and it seems reasonable to infer that the cost of whatever roads were built or purchased under it were intended to be a charge upon the branch only, and not upon the main line. If the limitation "under the thirteenth section" were held to be applicable only to that part of the third section which allows extensions of branch lines, it would result that, if the company constructed a branch road, its cost would be a charge on the branch line, and not upon the main line; but if it should purchase an independent line, the cost could be made a charge upon the main line.

(2.) It is hardly possible to suppose that the legislature intended to allow the company to "extend," that is, to construct any extension of a branch road, and at the same time to confer an unlimited power to purchase and hold any road con-

structed by another company. The rule, *noscitur a sociis*, applied to this case would undoubtedly limit the power to *purchase*, under the general clause, to such roads as the company was authorized to *build* under the preceding and more special clause. There is no reason why a power to build should be limited to *branch* roads, while the power to purchase should be so unlimited as to authorize the company to absorb parallel or competing lines, either within or without the State. Additional support for this construction is also found in the concluding words of the section empowering the company "to agree on terms to receive the cars of other roads on their said road." This would indicate an intention to permit the company to receive upon its main line the cars of other roads constructed or purchased as feeders to that line, but would scarcely be applicable to the cars of competing or parallel roads, which would seldom be required to be taken upon their line.

That the General Assembly could have intended to grant the broad powers claimed is also highly improbable in view of an act passed a little more than two years thereafter, (January 22, 1858,) by which all railroad companies were declared to have power and authority to make with each other contracts of the following character: *First*, for the consolidation of either the management, profits or stock of any two or more companies, the roads of which are or shall be so connected as to form a continuous road. *Second*, for the leasing of the road of one company to another, provided the roads so leased shall be so connected as to form a continuous line. This act is a general one, and the possibility of consolidating parallel or competing lines was evidently considered and reprobated.

As bearing upon the proper construction of this charter, as well as upon the question of actual parallelism, the case of the *State* v. *Vanderbilt*, 37 Ohio St. 590, is an instructive one. This was an action in *quo warranto* to test the legality of a consolidation of the Cleveland, Columbus, Cincinnati and Indianapolis Railway Company and the Cincinnati, Hamilton and Dayton Railroad Company, the former of which owned and controlled a road running from Cleveland upon

Lake Erie, by the way of Columbus, to Cincinnati, and the latter a road running from Toledo, at the western end of Lake Erie, by the way of Hamilton and Dayton, to Cincinnati. The statute provided that companies might consolidate, where their lines were so constructed as to admit of the passage of burden or passenger cars over any two or more of such roads *continuously* without break or interruption. The court held that, in view of the existence of a large commerce from the Southern States, by way of Cincinnati, to ports upon Lake Erie, as well as from such points southerly, by railroad lines converging at Cincinnati, these were substantially parallel and competing roads; that it might be inferred from the record that a leading object in making the consolidation was to destroy that competition; and that upon this state of facts, these roads were not so constructed as to admit the passage of burden or passenger cars over two or more of such roads *continuously*. In delivering the opinion it was observed that "where companies, situated as these are, being parallel and competing, claim that authority to consolidate has been granted to them, they must be able to point to words in the statute which admit of no other reasonable construction, for it will not be assumed that the law-making power has authorized the creation of a monopoly so detrimental to the public interest."

So in *Elkins* v. *Camden & Atlantic Railroad*, 36 N. J. Eq. 5, a statute authorized railroad companies to lease their roads or any part of them to any other corporation or corporations of that or any other State, or to unite and consolidate, as well as merge their stock, property, franchises and roads with those of any other company or companies; and that after such lease or consolidation, the company acquiring the other's road might use and operate such road. The court held that this did not authorize a railroad, running from Philadelphia to Atlantic City, to assume the debts and buy a majority of the stock and bonds and the equipment of a rival railroad running between the same termini, or to become the purchaser of its property at a foreclosure sale, or to control it after such sale in a reorganization of the company. The court.

enjoined the purchase, saying that "the purchase of a rival railroad is (not to speak of public policy) foreign to the objects for which the defendant was incorporated. Nor can the purchase be regarded as within the authority given by the defendant's charter to build lateral or branch roads. . . . As a purchase with a view to extinguishing competition, the transaction is clearly *ultra vires*."

Defendant, however, further urges in support of its assumed rights under the third section of the charter of 1856, a contemporaneous construction by the parties in interest, under which several lines were purchased which ran parallel to some of its own branches, and one of which, known as the Cecilia branch, about fifty miles in length, running substantially parallel to its main line, which it purchased and held for a short time, and then sold to the Chesapeake Co. These, however, were local lines, which either ran parallel to the branches of the L. & N., such as the Owensboro and Nashville, and the Bardstown branch, or an extension of its main line, such as the Louisville, Cincinnati and Lexington, running from Louisville to Cincinnati, or a short line like the Cecilia branch, running parallel to the main line; yet, as the terminus at one end or the other was in most cases different, it can hardly be said that any of these were competing lines, or that their purchase showed such an acquiescence on the part of the State as to estop it from opposing the purchase of a through line from Louisville to Memphis, by the way of Paducah — a line which connects the principal termini of the L. & N. Co. by a road substantially parallel, and no part of which is more than 50 miles from the corresponding part of the L. & N. Putting the broadest construction upon what was actually done, it amounts to no more than that the company made several purchases of local lines, in which the State acquiesced. That the State may have seen fit in particular cases to ratify the acquisition of local lines parallel to certain branch lines of the main road, does not argue that it intended to approve the purchase of parallel and competing through lines, especially in view of the act of June 22, 1858, which limited the power to consolidate or lease to roads so connected as to form a continuous line.

Indeed, these acquisitions appear to have been deemed so little in contravention of the public policy of the State, that the General Assembly did not hesitate to confirm them by special acts, and to receive taxes upon them as part of the L. & N. system.

While the doctrine of contemporaneous construction is doubtless of great value in determining the intentions of parties to an instrument ambiguous upon its face, yet to justify its application to a particular case, such contemporaneous construction must be shown to have been as broad as the exigencies of the case require. In this view we cannot say that a contemporaneous construction of this charter, which ratified the purchase of a few short local lines, was sufficient to justify the company in consolidating with a parallel and competing line between its two principal termini, with a view of controlling the through traffic from the lower Mississippi to Cincinnati, and destroying the competition which had previously existed between the two lines. It is possible that the Commonwealth might, if it had seen fit to do so, have enjoined the acquisition of some of these parallel lines, and the fact that it did not deem such purchases to be in contravention of public policy ought not to estop it from setting up an opposition to another purchase, which, in its view, is detrimental to the public interests. As is said by Mr. Justice Cooley, in his Constitutional Limitations, (6th ed.) page 85 : "A power is frequently yielded to merely because it is claimed, and it may be exercised for a long period in violation of the constitutional prohibition, without the mischief which the Constitution was designed to guard against appearing, or without any one being sufficiently interested in the subject to raise the question; but these circumstances cannot be allowed to sanction a clear infraction of the Constitution." We are, therefore, of opinion that the Court of Appeals was substantially correct in saying that "though thirty-eight years since the passage of the act of 1856 and thirty-six since the act of 1858 had elapsed, when this action was commenced, the L. & N. Co. never before claimed or attempted to exercise the right to purchase and hold parallel and competing lines, except about 1878, when

it purchased the road from Louisville to Cecilia Junction, which was held only a short time and then sold to the Chesapeake, Ohio and Southwestern Company."

That the lines proposed to be consolidated are parallel and competing is evident from an inspection of the map, since both connect the two important cities, Louisville and Memphis, which constitute their termini, and are natural competitors for the traffic from the Southwestern to the Northeastern States by way of Cincinnati, as well as that in the opposite direction. The object of the consolidation is obviously to enable the L. & N. to obtain a complete monopoly of all the traffic through the western half of the State. Conceding that that part of the Chesapeake line which ran from Elizabethtown to Paducah was originally a branch line of the L. & N., and might have been acquired as such under section 3 of the act of 1856, it ceased to be such after the Cecilia branch was acquired, and the line was extended from Paducah to Memphis. It then became a parallel and competing line within the meaning of the constitution.

In reply to the argument that millions of dollars have been invested in the securities of the company upon the faith of what was supposed to be its admitted powers, and that its capital stock of $1,500,000 in 1856 has expanded to $51,000,000, it is sufficient to say that, in making such investments, capitalists were bound to know the authority of the company under its charter, and to put the proper interpretation upon it; and that we are not at liberty to presume that investments were made upon the faith of powers that do not exist; and, if they were, the Commonwealth is not bound to respect investments made under a misapprehension of the law. Indeed, the argument proves too much, and would justify the inference that capitalists put their money into the road upon the assumption that it had been given irrevocable right to absorb to itself every road which might thereafter be constructed within the limits of the Commonwealth.

2. Besides this, however, in order to support the proposed consolidation of these two systems, the parties are bound to show, not only that the L. & N. Co. was competent to buy, but

that the Chesapeake Co. was also vested with power to sell. To make a valid contract it is necessary to show that both parties are competent to enter into the proposed stipulations. It is a fundamental principle in the law of contracts that, to make a valid agreement, there must be a meeting of minds, and, obviously, if there be a disability on the part of either party to enter into the proposed contract there can be no valid agreement. As was said by this court in *St. Louis Railroad* v. *Terre Haute Railroad*, 145 U. S. 393, 404: " It is unnecessary, however, to express a definitive opinion upon the question whether a contract between these parties was beyond the corporate powers of the plaintiff, because, as held by the decisions of this court already cited, a contract beyond the corporate power of either party is as invalid as if beyond the corporate powers of both, and the contract in question was clearly beyond the corporate powers of the defendant." See also *Thomas* v. *Railroad Co.*, 101 U. S. 71; *Oregon Railway* v. *Oregonian Railway Co.*, 130 U. S. 1; *Pennsylvania Railroad* v. *St. Louis, Alton &c. Railroad*, 118 U. S. 290; *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 24.

The Chesapeake Co. was incorporated under an act of the General Assembly of Kentucky, passed in 1881, (Acts of 1881, p. 258,) the ninth section of which declares that the corporation should be " governed by any general law enacted by the legislature of this State in regard to consolidation with parallel or competing lines." So that, although organized prior to the adoption of the constitution of 1891, it became subject at once, and as soon as said constitution was adopted, to its provision declaring that no railroad should consolidate its capital stock, franchise or property with that of any other owning a parallel or competing line or structure.

The only answer attempted to this proposition is that the cases above cited in support of the doctrine that to make a valid sale there must be power both in the seller to sell and in the buyer to buy, refers only to private, voluntary sales, arranged between the companies, and dependent upon their respective corporate powers; and that the doctrine has no

application to judicial or involuntary sales, where the property is seized upon to satisfy a debt of the corporation.

We do not understand, however, that the fact that a purchase is made at a judicial sale confers upon the purchaser any right he is forbidden to acquire, if the purchase had been made at private sale. If, from reasons of public policy, the legislature declares that a railway shall not become the purchaser of a parallel or competing line, the purchase is not the less unlawful, because the parties choose to let it take the form of a judicial sale. A person who, by reason of any statutory disability, such as infancy, lunacy, marriage or otherwise, is incompetent to buy at private sale is not less incompetent from becoming the purchaser at a judicial sale. The prohibition is not upon the power of the court foreclosing the mortgage to order a judicial sale of the property, but upon its power to confirm a sale made to a parallel or competing road. The allegation of the bill in this connection is that suits have been filed upon claims against the several companies interested, with the object of having a judicial sale of their property, so that the L. & N. Co. may purchase the property in its own name, or in the name of some new company or companies organized by it or in which it shall have a controlling interest. It is true, as was observed in *Pearsall* v. *The Great Northern,* that the stockholders of the L. & N. Co. may individually become the purchasers of the Chesapeake Co. at a judicial sale, and may organize a new corporation, but it would still be a corporation separate and distinct from that of the L. & N. Co. The inhibition of the Constitution is not against the sale to individuals, though they may chance to be stockholders in a competing line, but against the acquisition by a railway, in any form, of a parallel or competing line. If this could be evaded by going through the form of a judicial sale, the constitutional provision would be of no value.

3. But, conceding that the L. & N. Co. was vested by the act of January 17, 1856, with the right to purchase all railroads constructed by other companies, whether parallel or competing or not, and that by virtue of such power it might become the purchaser of the Chesapeake system, it is still

insisted on behalf of the Commonwealth that this act was subject to an act approved February 14, 1856, the first section of which enacted that "all charters and grants of or to corporations, or amendments thereof, and all other statutes, shall be subject to amendment or repeal at the will of the legislature, unless a contrary intent be therein plainly expressed." The third section of this act provided that the act should apply only to "charters and acts of incorporation to be granted hereafter; and that this act shall take effect from its passage." The argument is that, as this act was given immediate effect, while the former act, under a general law of the State, did not take effect until two months from the time it was approved by the governor, the act of February 14 was, in reality, the prior act, and the charter of January 17 was, in fact, granted thereafter, within the meaning of the third section of the act of February 14.

The answer of the defendant to this was that the thirteenth section of the Tennessee act of 1855, which was reënacted in the first section of the Kentucky act of January 17, provided "that this act shall take effect from and after its passage." If the adoption verbatim of this Tennessee act by the Kentucky legislature was sufficient to give the Kentucky act immediate effect, then, undoubtedly, the act of February 14 was a subsequent act and did not apply to the charter of January 17. Upon the other hand, if the reënactment of the thirteenth section of the Tennessee act was not intended to give the Kentucky charter immediate effect, then this charter did not become operative until March 17, and thereby became subject to the reservation statute of February 14, which did take immediate effect. This question was elaborately argued at the bar, but, for the reasons hereafter stated, we do not consider it necessary to express a decided opinion upon the point.

4. Whatever be the disposition of this question, and however broad the powers of the L. & N. Co., under its charter of 1856, we are still confronted with the proposition that the proposed consolidation of these two railway systems is a clear violation of section 201 of the constitution, which forbids the

consolidation of the stock, franchises or property, as well as the purchase and lease of parallel and competing lines. Unless this section impairs the obligation of the contract contained in the. charter, it operates as a repeal of any power that may possibly be deduced from such charter to purchase, lease or consolidate with any parallel or competing line. In this particular the case differs from that of *Pearsall* v. *Great Northern Railway*, just decided, only in the fact that the charter of the Great Northern, while conferring a power to consolidate with other roads in much clearer and more explicit language than was used in the L. & N. charter, also contained in section 17 the reservation of a power to amend in any manner not destroying or impairing the vested rights of the corporation. The opinion in that case dealt largely with the question whether a subsequent act of the legislature taking away this power so long as it was unexecuted, and so far as it applied to parallel or competing lines, impaired a vested right. Our conclusion was that it did not.

We regard the issue presented in this case as involving practically the same question. While there is no general reservation clause in the charter of the L. & N. Co., we think, for the reasons stated in the *Pearsall case*, that under its police power the people, in their sovereign capacity, or the legislature, as their representatives, may deal with the charter of a railway corporation, so far as is necessary for the protection of the lives, health and safety of its passengers or the public, or for the security of property or the conservation of the public interests, provided, of course, that no vested rights are thereby impaired. In other words, the legislature may not destroy vested rights, whether they are expressly prohibited from doing so or not, but otherwise may legislate with respect to corporations, whether expressly permitted to do so or not. While the police power has been most frequently exercised with respect to matters which concern the public health, safety or morals, we have frequently held that corporations engaged in a public service are subject to legislative control, so far as it becomes necessary for the protection of the public interests. In the case of *Munn* v.

*Illinois,* 94 U. S. 113, Mr. Chief Justice Waite said: "Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but so long as he maintains the use, he must submit to the control."

There was a difference of opinion in the court as to whether this language applied to elevators in such manner as to empower the legislature to fix their charges; but it has been too often held that railways were public highways, and their functions were those of the State, though their ownership was private, and that they were subject to control for the common good, to be now open to question. It was so expressly stated in *Olcott* v. *Supervisors,* 16 Wall. 678, 694. This power was held to extend, in *New York* v. *Miln,* 11 Pet. 102, to a law requiring the masters of emigrant vessels to report an account of their passengers; in the *Railroad Commission cases,* 116 U. S. 307, to the right of a State to reasonably limit the amount of charges by a railway company for the transportation of persons and property within its jurisdiction, notwithstanding a statute which granted to it the right "from time to time to fix, regulate and receive the tolls and charges by them to be received for transportation;" in *Mugler* v. *Kansas,* 123 U. S. 623, to legislation which prohibited the manufacture of intoxicating liquors within the limits of the State, even as to persons who, at the time, happened to own property, whose chief value consisted in its fitness for such manufacturing purposes; in *Georgia Banking Co.* v. *Smith,* 128 U. S. 174, to the prevention of extortion by railways, by unreasonable charges, and favoritism by discriminations; in *Charlotte &c. Railroad* v. *Gibbes,* 142 U. S. 386, to a requirement that the salaries and expenses of a state railroad commission be borne by the railroad corporations within the State; in *New York & New England Railroad* v. *Bristol,* 151 U. S. 556, to a statute com-

pelling the removal of grade crossings; in *Commonwealth* v. *Alger*, 7 Cushing, 53, to the establishment of harbor lines, beyond which land owners shall not extend their wharves; and in *Eagle Insurance Co.* v. *Ohio*, 153 U. S. 446, to a requirement that insurance companies make returns to the proper state officers of their business conditions, etc., notwithstanding the company be organized under a special charter, which did not in terms require it to make such return.

Indeed, it was broadly held in *Chicago Life Insurance Co.* v. *Needles*, 113 U. S. 574, that the grant of a corporate franchise is necessarily subject to the condition that the privileges and franchises conferred shall not be abused, or employed to defeat the ends for which they were conferred; and that, when abused or misemployed, they may be withdrawn by proceedings consistent with law. It was said in this case that an insurance corporation was subject to such reasonable regulations as the legislature might from time to time prescribe, for the general conduct of its affairs, serving only to secure the ends for which it was created, and not materially interfering with the privileges granted to it. "It would be extraordinary," said the court, (page 580,) "if the legislative department of a government, charged with the duty of enacting such laws as may promote the health, the morals and the prosperity of the people, might not, when unrestrained by constitutional limitations upon its authority, provide, by reasonable regulations, against the misuse of special corporate privileges which it has granted, and which could not, except by its sanction, express or implied, have been exercised at all." It was further held that the establishment against such a corporation before a judicial tribunal that it was insolvent, or that its condition was such as to render its continuance in business hazardous to the public; or that it had exceeded its corporate powers; or that it had violated the rules, restrictions or conditions prescribed by law, constituted a sufficient reason for the State, which created it, to reclaim the franchises and privileges granted to it.

We think that the principle of these cases applies to the power of the legislature to forbid the consolidation of parallel

or competing lines, whenever, in its opinion, such consolidation is calculated to affect injuriously the public interests. Not only is the purchase of stock in another company beyond the power of a railroad corporation in the absence of an express stipulation in the charter, but the purchase of such stock in a rival and competing line is held to be contrary to public policy and void. Cook on Stockholders, § 315; *Central Railroad Co.* v. *Collins*, 40 Georgia, 582; *Hazlehurst* v. *Savannah &c. Railroad Co.*, 43 Georgia, 13; *Elkins* v. *Camden & Atlantic Railroad Co.*, 36 N. J. Eq. 5. The doctrine is peculiarly applicable to this case, in which it is shown that the Chesapeake Co. was largely aided in its construction by contributions from municipalities along its line for the very purpose of obtaining competition with the L. & N. Co. — a purpose which would, of course, be defeated by a combination with it. This restriction upon the unlimited power to consolidate with other roads is not, as the plaintiff in error suggests, called for by any new view of commercial policy, but in virtue of a settled policy which has obtained in Kentucky since 1858, in Minnesota since 1874, in Ohio since 1851, in New Hampshire since 1867, and by more recent enactments in some dozen other States — a policy which has not only found a place in the statute law of such States as apprehended evil effects from such consolidations, but has been declared by the courts to be necessary to protect the public from the establishment of monopolies. Indeed, the unanimity with which the States have legislated against the consolidation of competing lines shows that it is not the result of a local prejudice, but of a general sentiment that such monopolies are reprehensible. The fact that, in certain cases, the legislature has seen fit to sanction the consolidation of parallel roads does not militate against the general principle that the consolidation of competing lines is contrary to public policy. Parallel lines are not necessarily competing lines, as they not infrequently connect entirely different termini and command the traffic of distinct territories. For instance, a line from Toledo to Cincinnati is substantially parallel with another from Chicago to Cairo, but they could scarcely be called competing, since one is dependent upon the traffic of

the Northwest, while Cincinnati is the southern outlet of the traffic of the Northeastern States and the lower lakes. Another familiar instance is that of the three north and south railways through the State of Connecticut, one from Bridgeport to Pittsfield, in Massachusetts, another from New Haven to Springfield, and another from Norwich to Worcester. These are strictly parallel lines, but in only a limited sense competing, since they are between different termini, and each is required for the trade of its own section of the State. Even in the present case the competition is mostly confined to the through traffic. Considerations of this kind may induce legislatures, in particular instances, to permit the consolidation of parallel roads without intending thereby to relinquish their right to forbid the consolidation of such parallel lines as are in fact competing.

Permission to consolidate such roads is no more to be taken as an approval of a general policy of consolidation than are the laws which have been repeatedly upheld by this court, granting corporations exclusive privileges to supply municipalities with the comforts of life for a certain number of years, of which class of monopolies the one upheld in *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, is a distinguished example. Such cases are, however, exceptional, and rest upon the theory of an authority expressly vested in the corporation for a limited time, in consideration of benefits likely to accrue to the public from the establishment of a particular industry. Even in such cases, however, we have held that the monopoly may be modified or abrogated, if it proved to be prejudicial to the public health or public morals. *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746. In this case Mr. Justice Miller, in delivering the opinion of the court, observed, p. 750: " While we are not prepared to say that the legislature can make valid contracts on no subject embraced in the largest definition of the police power, we think that, in regard to two subjects so embraced, it cannot, by any contract, limit the exercise of such powers to the prejudice of the general welfare. These are the *public health* and *public morals*. The preservation of these is so necessary to the best interests of social organi-

zation that a wise policy forbids the legislative body to divest itself of the power to enact laws for the preservation of health and the repression of crime.". To the same effect are *Boyd* v. *Alabama*, 94 U. S. 645 ; *Beer Co.* v. *Massachusetts*, 97 U. S. 25.

There are doubtless cases where the police power has been invoked to justify acts of the legislature which were dictated to a certain extent by local interests, or with the effect of unduly burdening or interfering with foreign or interstate commerce. Within this category are laws levying taxes upon alien passengers arriving from foreign ports, for the use of hospitals, *The Passenger cases*, 7 How. 283 ; requiring a bond to be given for every such passenger to indemnify the State against expense for the relief or support of the person named in the bond, *Henderson* v. *New York*, 92 U. S. 259 ; even though such bonds be limited to lewd and debauched women, *Chy Lung* v. *Freeman*, 92 U. S. 275 ; prohibiting the driving or conveying of foreign cattle into the State between certain dates, *Railroad Co.* v. *Husen*, 95 U. S. 465 ; taxing persons from other States engaged in selling or soliciting the sale of liquors, to be shipped into the State from places without it, without imposing a tax upon similar agents for manufacturers within the State, *Walling* v. *Michigan*, 116 U. S. 446 ; *Welton* v. *Missouri*, 91 U. S. 275 ; statutes requiring inspection, before slaughtering, of cattle, sheep and swine designed for slaughter for human food, so far as they apply to foreign meats, *Minnesota* v. *Barber*, 136 U. S. 313 ; a similar statute prohibiting the sale of meat from animals slaughtered one hundred miles or more from the place at which it was offered for sale, unless previously inspected by local inspectors, *Brimmer* v. *Rebman*, 138 U. S. 78 ; and finally, to statutes requiring a license, under onerous conditions, from the agents of foreign express companies, *Crutcher* v. *Kentucky*, 141 U. S. 47.

These cases, however, do not infringe upon the general principle, so frequently declared, that where the police power is invoked in good faith for the prohibition of a practice which the legislature has declared to be detrimental to the public interests, it will be sustained, wherever it can be done without the impairment of vested rights. Notwithstanding these

cases, the general rule holds good that whatever is contrary to public policy or inimical to the public interests is subject to the police power of the State, and within legislative control, and in the exertion of such power the legislature is vested with a large discretion, which, if exercised *bona fide* for the protection of the public, is beyond the reach of judicial inquiry.

5. But little need be said in answer to the final contention of the plaintiff in error, that the assumption of a right to forbid the consolidation of parallel and competing lines is an interference with the power of Congress over interstate commerce. The same remark may be made with respect to all police regulations of interstate railways. All such regulations interfere indirectly, more or less, with commerce between the States, in the fact that they impose a burden upon the instruments of such commerce, and add something to the cost of transportation, by the expense incurred in conforming to such regulations. These are, however, like the taxes imposed upon railways and their rolling stock, which are more or less, according to the policy of the State within which the roads are operated, but are still within the competency of the legislature to impose. It is otherwise, however, with respect to taxes upon their franchises and receipts from interstate commerce, which are treated as a direct burden. There are certain intimations in some of our opinions, which might perhaps lead to an inference that the police power cannot be exercised over a subject confined exclusively to Congress by the Federal Constitution. But while this is true with respect to the commerce itself, it is not true with respect to the instruments of such commerce.

It was said in *Sherlock* v. *Alling*, 93 U. S. 99, 103, 104, and quoted with approbation in *Plumley* v. *Massachusetts*, 155 U. S. 461, that " in conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to the health, life and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it with-

out constituting a regulation of it, within the meaning of the Constitution, . . . and it may be said, generally, that the legislation of a State, not directed against commerce or any of its regulations, but relating to the rights, duties and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce foreign or interstate, or in any other pursuit."

It has never been supposed that the dominant power of Congress over interstate commerce took from the States the power of legislation with respect to the instruments of such commerce, so far as the legislation was within its ordinary police powers, Nearly all the railways in the country have been constructed under state authority, and it cannot be supposed that they intended to abandon their power over them as soon as they were finished. The power to construct them involves necessarily the power to impose such regulations upon their operation as a sound regard for the interests of the public may seem to render desirable. In the division of authority with respect to interstate railways Congress reserves to itself the superior right to control their commerce and forbid interference therewith; while to the States remains the power to create and to regulate the instruments of such commerce, so far as necessary to the conservation of the public interests.

If it be assumed that the States have no right to forbid the consolidation of competing lines, because the whole subject is within the control of Congress, it would necessarily follow that Congress would have the power to authorize such consolidation in defiance of state legislation — a proposition which only needs to be stated to demonstrate its unsoundness. As we have already said, the power of one railway corporation to purchase the stock and franchises of another must be conferred by express language to that effect in the charter, and hence, if the charter of the L. & N. Co. had been silent upon that point, it will be conceded that it would have no power to make the proposed purchase in this case. As the power

to purchase, then, is derivable from the State, the State may accompany it with such limitations as it may choose to impose. Its results, then, from the argument of the appellant that, if there be any interference with interstate commerce it is in imposing limitations upon the exercise of a right which did not previously exist, and hence, if the State permits such purchase or consolidation, it is bound to extend the authority to every possible case, or expose itself to the charge of interfering with commerce. This proposition is obviously untenable.

While the constitutional power of the State in this particular has never been formally passed upon by this court, the power of state legislatures to impose this restriction upon the general authority to consolidate has been recognized in a number of cases. *Railroad Co.* v. *Maryland,* 21 Wall. 456, 470; *Shields* v. *Ohio,* 95 U. S. 319; *Wallace* v. *Loomis,* 97 U. S. 146, 154; *New Buffalo* v. *Iron Co.,* 105 U. S. 73; *Leavenworth* v. *Chicago &c. Railway,* 134 U. S. 688, 699; *Livingston County* v. *Portsmouth Bank,* 128 U. S. 102; *Keokuk & Western Railroad* v. *Missouri,* 152 U. S. 301; *Ashley* v. *Ryan,* 153 U. S. 436. In the last case it was broadly held that a State, in permitting railway companies to consolidate, might impose such conditions as it deemed proper, and that the acceptance of the franchise implied a submission to the conditions, without which it could not have been obtained.

The power to forbid such purchase or consolidation with competing lines has been directly upheld in a large number of cases in the state courts, in some of which cases a violation of the commerce clause was suggested, and in others it was not. *Hafer* v. *Cincinnati, Hamilton & Dayton Railroad,* 29 Wkly Law Bull. 68; *State* v. *Atchison & Red River Railroad,* 24 Nebraska, 143; *Gulf, Col. & Santa Fé Railway* v. *State,* 72 Texas, 404; *East Line &c. Railway* v. *Rushing,* 69 Texas, 306; *Pennsylvania Railroad* v. *Commonwealth,* 7 Atl. Rep. 368; *Montgomery's Appeal,* 136 Penn. St. 96; *Currier* v. *Concord Railroad,* 48 N. H. 321; *Texas & Pacific Railway Co.* v. *Southern Pacific Railway Co.,* 41 La. Ann. 970. See also *Langdon* v. *Branch,* 37 Fed. Rep. 449; *Hamilton* v. *Savannah*

&c. *Railroad*, 49 Fed. Rep. 412; *Clark* v. *Central Railroad*, 50 Fed. Rep. 338; *Kimball* v. *Atchison, Topeka &c. Railroad Co.*, 46 Fed. Rep. 888.

In conclusion we are of opinion —

1. That a general right to purchase or consolidate with other roads was never conferred upon the L. & N. Co.

2. That the Chesapeake Co. was never vested with the power to consolidate its capital stock, franchises or property with that of any other road owning a parallel or competing line.

3. That, conceding that the requisite power existed in both the above companies, section 201 of the constitution of 1891 was a legitimate exercise of the police power of the State, and forbade such consolidation, at least so far as such power remained unexecuted.

The decree of the Court of Appeals of Kentucky is, therefore, *Affirmed.*

MR. JUSTICE BREWER and MR. JUSTICE WHITE concurred in the result.