## POWERS ON THE STATE RAILROAD AND THE INTERSTATE COMMERCE COMMISSIONS RESPECTIVELY.

Common Pleas Court of Franklin County.

THE ANN ARBOR RAILROAD CO. ET AL V. RAILROAD COMMIS-
SION OF OHIO.

Decided, April, 1909.

*Car Service Regulations—Authority of the State Railroad Commission to Regulate Demurrage Charges and Free Time to Consignees Limited to Intrastate Commerce—Concessions for Individual Convenience a Clog on Commerce Generally—Instruments of Commerce Distinguished from Commerce Itself—Lessening Significance of State Lines—When Interstate Commerce Begins and When it Ends with Reference to a Particular Shipment.*

The regulations adopted by the Ohio Railroad Commission with reference to car service are invalid as to interstate shipments over interstate commerce railways, but as to intrastate commerce they are valid and enforcible.

*John F. Wilson, C. O. Hunter, Edward Colston, Theodore W. Reath, F. A. Durbin, Squire, Sanders & Dempsey,* for plaintiffs.

*U. G. Denman,* Attorney-General, *O. E. Harrison* and *John R. Horst,* of counsel for defendants.

KINKEAD, J.

The questions arise upon demurrer to the second cause of action.

Plaintiffs (thirty-five railroads), for their second cause of action, aver that the defendant commission on March 20, 1908, made an order determining and fixing certain car service charges, regulations and practices, to be imposed, observed and followed in the future by all the plaintiff railroad companies.

The petition thereupon sets forth each and all of the rules so made and now complained of.

Without enumeration or going into details, it may be stated that the only question urged in argument relates to car service regulations. objection being made by plaintiffs to rules allowing

forty-eight hours free time for cars containing 66,000 pounds, and seventy-two hours for cars containing more than 66,000.   Objection is made also to other allowances and increases of free time for car service.

It is claimed that rules 1, 2, 6, 12 and 14 are applicable to cars in transit; that the remainder of the rules relate to the receipt and delivery of property at the commencement and end of the carriage; that is, they regulate the free time which shall be allowed for the loading and unloading of cars, the charges which may be made for over-detention for such purposes, and the method of calculating such charges.

It is claimed that the receipt and delivery of property for interstate transportation, and the detention of cars for that purpose, is a part of the interstate commerce therein.

It is claimed that the delivery of cars to a shipper for loading of freight which is to be transported by the carrier from the place where the same is loaded to another state, is as much a part of interstate carriage as when the car and its contents are in transit.

The same claim is made in respect to freight delivered in cars in public or private loading places to be unloaded by the consignee; that interstate commerce does not end until the consignee has unloaded and relinquished the car.

It is conceded that the railroad commission has power simply to regulate intrastate commerce, but it is contended that it has, by the rules complained of, directly and immediately regulated interstate commerce.

It will readily be conceded that the cars of the plaintiff carriers are used indiscriminately in state and interstate transportation.

This being true, it is plain that if the rules apply and govern the use of all cars whether in state or interstate commerce, their detention indiscriminately according to the provisions of these rules, will constitute a restriction upon interstate commerce.

The rules in question which authorize the detention by consignees and consignors for the periods prescribed for interstate shipments, constitute a direct infringement of the constitutional

right of Congress to regulate commerce, as well as a violation of the interstate commerce act, provided such interstate commerce begins when the car is delivered to the consignor for loading, and ends only when the same is unloaded by the consignee.

But the claim of the railroad companies is carried farther than this, however. It is argued that the detention of cars for purposes of state commerce, has an indirect effect upon interstate commerce, because the total volume of available equipment is diminished by such detention, and the railroad affected, therefore, has fewer available cars for both state and interstate business than it would have if such detention were not permitted or were permitted for only a shorter time.

It is apparent, therefore, that if the contention of the railroad company be the correct and sound position, and interstate commerce does begin when the cars are placed at the disposal of the shipper by the company for loading, then the prevailing rule which has existed for so long, which does not impose the responsibility of the carrier, as such, until the car is loaded and the bill of lading is delivered to the shipper, will necessarily be ignored.

To reach the conclusion that interstate commerce begins when the car is delivered to the shipper, there must be some very potent and sound reasons for creating an exception to the familiar and long prevailing rule referred to.

If it is to be decided that interstate commerce does not *end* until the consignee has entirely unloaded the car, and thus relinquished it, in reliance upon the ordinary rule fixing the responsibility of the carrier, it might be urged that the same theory or principle should control in determining when interstate commerce *begins*.

The application of such a doctrine would result in one rule regulating the commencement of interstate commerce, and another the time of its completion.

The conditions and equitable adjustment of the rights of shipper, consignee and carrier in matters of liability for loss and responsibility therefor, have no relation or bearing upon the broad and comprehensive question of interstate commerce involved in determining the most advantageous methods of use and manipula-

tions of the immense equipment of the railroad systems, and consequent rules of law which shall be formulated to produce the best results, and to promote and foster interstate commerce between the states.

It is a well known fact that, in this modern age, the greatest percent of supplies for nearly every want are chiefly carried by means of interstate commerce shipments, either by way of importation or exportation. Almost everything we eat, for example, come from other states by means of interstate railroads. And many other things might be enumerated to show the magnitude and importance of the function of the great arteries of interstate commerce in the service of the people of the states. We must have in mind the convenience not only of the citizenship of one state, but of all.

The railroad in the state which does not engage in interstate commerce to some extent would be difficult to find.

A striking example of the abuses that may result from the enforcement of such rules as the railroad commission has enacted is well illustrated in the Pittsburg case, hereinafter cited, where the consignees of car load shipments of southern products used the cars from which to display their goods and sell them, converting the instruments of interstate commerce into local warehouses, to the disadvantage of shippers. The rules complained of extending the free time would tend to foster such abuses.

Those who have been giving special attention to freight car manipulation are alive to the situation. It is conceded on all hands that there ought to be proper regulation by competent authority to correct abuses on the part of railroad or shipper. The criticism of the association of railroad commissioners is of interest. Their report reads:

"It is to the interest of shippers that many concessions made by the railroads in the way of free time for cars should be withdrawn. The individual shipper who succeeds in using a coal car as a warehouse for ten or fifteen days free of charge may profit thereby, but he does so at the expense of other shippers who are entitled to have the use of the car for transportation of their coal. The pressure of the individual shippers to secure additional free time is really directed against the proper use of

cars and against the best interests of the shipping public as a whole. Some state authorities have yielded to this pressure of shippers and by so doing have complicated the transportation problem for shippers of other states. One New England state, for instance, has provided for four days free time for the loading and unloading of cars. This is double a reasonable allowance and is gained by the shippers of this state at the expense of the car supply of the entire country.

"A middle western state (Ohio), through its railroad commission during the past year, has increased the free time and introduced various rules in favor of particular classes of receivers of freight. The net result is that cars in that state are most largely used for warehouses."

This is an important expression of opinion on the wisdom and policy of such rules as are under test. It is the unanimous opinion of the national convention of railroad commissioners of the different states, held October 8th, 1908. It was participated in by an Ohio member who apologized for the rules, and he being present, the report was unanimously adopted.

All such detentions of cars to serve the mere local convenience of shippers or consignee tend to retard and clog the general service of the railroads.

The opinion expressed by the same body, likewise entitled to much weight, is that the public interest requires that car service rules should be uniform throughout the country. Four days' time in one state serves to give an advantage to the shippers of that state at the expense of other shippers. Cars withheld by shippers in one state interfere with shippers in another state.

This evidence, coming from railroad commissioners experienced and familiar with conditions, is evidence that the demand for free time comes from the selfish interests of the shippers, and that the general good is thereby lost sight of. It must be observed that the commissioners are *quasi* judicial officers.

The controlling principle leading the court to the conclusion that the rules in question are designed in effect to restrict interstate commerce, is that the interest of the general shipping public demand the very greatest dispatch possible.

The local regulation of this matter being prompted by the demands of shippers for more free time turns the mind towards

uniformity of regulation which can best be secured by national regulation by virtue of the interstate commerce clause, and the laws passed by Congress in pursuance thereof.

We look to the interest of the general shipping public; not necessarily to that of the railroads. The latter are the servants of the people, who want and have the right to demand of them prompt and efficient service.

That the railroads are servants and the people their master, is demonstrated by the creation of railroad commissions, and the interstate commerce commission, which have supervisory control over them.

It is highly important that the powers of each of these bodies be well defined to avoid conflict and confusion.

It has been suggested that there should not be a division of authority over what is practically one mass of equipment; that the entire body of railroad equipment is part of practically one system of transportation. That the body of freight car equipment being practically a unit, the system of rules governing its use should be free from conflict.

It seems from the foregoing consideration that the decision of this question, vastly more important than mere local convenience of local shippers, must ignore the personal or individual interest, as well as the ordinary rule of law applicable to receipt and delivery of freight, and the rules arising therefrom, fixing the rights and responsibility of shipper and carrier.

The constitutional frame work of the federal government was built so as to permit expansion and growth. In the great march of progress we look back at the work of our forefathers in the construction of the Constitution with astonishment. The interstate commerce clause has been more useful as business expands, and state lines do not have so much meaning as formerly.

True, there is strong opposition to such a theory, but we can not fail to see that the greater bulk of our commerce is interstate.

Looking at the problem squarely, it seems entirely clear that the interstate commerce clause of the federal Constitution embraces not only the contract between the shipper in the one state and the consignee in the other, but the railroad company as the

medium between the two, all three of which parties are engaged in the business of interstate commerce, and their conduct and contract are subject to federal regulation. But the chief responsibility and the greatest demand is upon the carrier, as without it there would be no interstate commerce, so that all of its conduct and acts having to do with interstate commerce are subject to the control of Congress. The contract which the carrier makes to furnish cars to shipper, or to grant the use thereof in case of interstate commerce shipment, to the consignee is subject to control of Congress. As the contract to ship and the regulation of the use of its cars and equipment are one and the same thing, it follows that the duties and conduct of the carrier in such matters in all shipments from a consignor in one state to a consignee in another, as well as the rights which exist between the carrier and the consignee in the use of the cars and equipment of the road, fall within congressional regulation and not within state control. These statements are intended to apply to interstate and not intrastate business. Congress having committed such matters to the interstate commerce commission, that body has the exclusive power to regulate such matters and not the state through its railroad commission.

Directing attention to the claim of counsel for the commission, that demurrage is a local charge, independently paid for, and is not a part of the published tariff rate, the reasons already advanced may be a sufficient answer.

The fact is, however, that Congress in obedience to the constitutional mandate touching interstate commerce, has already spoken. It has created the interstate commerce commission and clothed it with certain powers. In pursuance thereof the commission has provided (Sec. 10, p. 16, Regulations Int. Com. Com.) that:

"Each carrier shall publish * * * and file separate tariffs, which shall contain in clear, plain, and specific form and terms all the terminal charges and all allowances, such as arbitraries, switching * * * transit privileges, and car service, together with all other privileges, charges and rules which in any way increase or decrease the amount to be paid on any shipment."

But it is said by counsel that even if the interstate commerce act can be construed to give the interstate commerce commission authority to make car service rules, the commission has not acted in relation thereto and the power has not been withdrawn from the state. But Congress has acted and the commission is acting in pursuance thereof. Looking to the regulations of the commission, if this may properly be done now, it would seem that the regulations by the commission requires railroads engaged in interstate commerce to publish car service tariffs. And this, it appears, is being done by the railroads.

Special stress is laid upon the claim that the rules in question operate rather upon the *instruments of commerce;* that the cars are mere instruments of commerce and not necessarily part of commerce itself, and therefore the regulation by the state railroad commission touching demurrage for car service, is a mere regulation of the use of instruments of commerce and not of interstate commerce.

In support of this position adjudications by the federal courts are offered for consideration in this connection.

For instance, in *Louisville & Nashville R. R. Co.* v. *Kentucky,* 161 U. S., 677, the Supreme Court by Mr. Justice Brown, in discussing a question of state regulation within the province of police regulation, said:

"It has never been supposed that the dominant power of Congress over interstate commerce took from the states the power of legislation with respect to the instruments of commerce, so far as the legislation was within its ordinary police powers. * * * In the division of authority with respect to interstate railways Congress reserves to itself the superior rights to control their commerce and forbid interference therewith; while to the state remains the power to create and to regulate the instruments of such commerce, so far as necessary to the conservation of the public interests."

All regulations by states coming within such a rule and being within the police regulation are consistent with the position taken by the court in this case. Regulation has been made by the states of rates of speed, the prohibition of the running of freight trains on Sunday, promoting the safety and comfort of passen-

gers, employes, and the like.   Prescribing the rates of fare has been undertaken and sustained by some state courts.   But this regulation is not mentioned as one of the police regulations.

The regulations named have been sustained as not infringing upon interstate commerce, but rather in aid thereof.

A sufficient answer to the point made as to the regulation of the instruments of commerce is to be found in the interstate commerce act.   It is made to apply to "any common carrier or carriers engaged in the *transportation* of passengers or property wholly by railroad   *   *   *   from one state   *   *   *   of the United States   *   *   *   to any other state," etc.

It then defines "transportation."

"And the term '*transportation*' shall include cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt, delivery, elevation, and transfer in transit, etc.; *and it shall be the duty of every carrier subject to the provisions of this act to provide and furnish such transportation* upon reasonable request therefor, and to establish through routes and just and reasonable rates applicable thereto.   *   *   *   *And shall furnish cars for the movement of such traffic to the best of its ability* without discrimination, etc.   *   *   *   And shall. file with the commission   *   *   *   and print and keep open to public inspection schedules showing all rates, fares and charges. *   *   *   The schedule shall plainly state   *   *   *   all terminal charges, storage charges, icing charges, and all other charges which the commission may require, all privileges or facilities granted or allowed and any rules or regulations which in anywise change, affect, or determine any part or the aggregate of such aforesaid rates, fares and charges, or the value of the service rendered the passenger, *shipper* or *consignee*."

This act shows a distinct purpose to assume control or supervision of the transportation facilities, and all charges legitimately connected with and a part of the interstate shipment.

This court will be content with the expression of its own reasons for the conclusions reached, and will not undertake to enter into an extended discussion of the federal authorities cited by counsel for defendant.   It is sufficient to state that so often gen-

eral expressions may be gathered from decisions which, separated from the facts of the particular case, would seem to apply to another situation. In answer to the federal citations of counsel for the commission, the statement of the Supreme Court made in *Wabash Railway Company* v. *Illinois*, 118 U. S., 558, may be sufficient, viz.:

"Notwithstanding what is there said, this court holds now, and has never consciously held otherwise, that a statute of a state, intended to regulate or to tax or to impose any other restriction upon the transmission of persons or property or telegraphic messages from one state to another, is not within that class of legislation which the states may enact in the absence of legislation by Congress; and that statutes are void even as to that part of such transmission which may be within the state."

This statute seems to place the entire body of freight car equipment of interstate roads within the control of the interstate commerce commission. This body has been exercising the power of regulating the car service. On March 16, 1908, it held that questions of demurrage and car service on interstate shipments are within the jurisdiction of the interstate commerce commission, and did not concur in the view that such matters, even when pertaining to interstate shipments, are within the control of state commissions.

In *Wilson Produce Company* v. *Pennsylvania Railroad Company*, No. 1472, decided June 24, 1908 (14 Inter. Com. Com. Rep., p. 170), it held that:

"The duty of regulating terminal charges, when relating to traffic between the states, has been lodged with the interstate commerce commission. A state statute fixing terminal charges is not controlling with respect to interstate transportation."

In this case the complainants were dealers in fruit in Pittsburgh. About eighty-five per cent. of the produce was sold from the cars, using them as warehouses. The yard became congested, which was largely due to the custom of retaining cars in order to make sales or to await a favorable market.

Commodities were even moved one car to another for exhibition. Lane, Commissioner, said:

"Track storage charges where associated with an interstate movement appertain directly to interstate commerce. They represent the carriers' compensation for services rendered in connection with the transportation. A shipment is not completed until arrived at destination and delivery to the consignee; and the authority vested in Congress by the commerce clause of the Constitution covers everything related to the delivery of freight between the states.

"In the case of *Interstate Commerce Commission* v. *Detroit, etc., Ry. Co.*, 167 U. S., 633, the Supreme Court suggested that the commission would be acting within its powers if it should order the railway companies should regard cartage, when furnished free, as a terminal charge and include it in their schedules.

"If cartage charges may be regarded as a proper subject for national regulation, federal authority over demurrage and track storage charges in connection with interstate commerce can not be challenged.

"We think we may go further and hold that the federal authority in this field is exclusive. It is well settled that in the absence of congressional action the states may legislate with respect to matters which are strictly local in character, even though in so doing they may to some extent regulate interstate commerce; but, as said by the Supreme Court in the *Port Wardens Case*, 12 How. Pr., 'Whatever subjects of this power are in their nature national, or admit only of one uniform system or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress.'

"The question of terminal charges imposed in connection with interstate transportation would seem to be within the scope of this principle. The subject is national in character, and uniformity of legislation is essential. If the individual states were permitted to legislate in this field, endless confusion and discrimination would be the result. Such regulation would operate as a direct burden upon interstate commerce, and the Supreme Court has repeatedly refused to sustain laws which had this effect. But it is unnecessary to decide that the federal authority over this subject is exclusive, inasmuch as Congress has taken definite action and removed the subject althogether from the field of state regulation. The first section of the act to regulate commerce, after outlining the scope of the commission's jurisdiction, defines transportation."

The opinion then sets forth the paragraph of the law which has been heretofore quoted.

Then, proceeding, the commission says:

"Power of Congress to act with reference to this subject is indisputable; that Congress has made provisions for the regulation for these charges is just as clear; and it follows necessarily that a state law which conflicts with the federal statutes must give way."

One federal lower court decision is cited in support of the plaintiffs, which supports their contention.

In *Michie* v. *N. Y. & C. H. R. Co.*, 151 Fed., 694, it was held that demurrage or car service charge made by an interstate railroad company for the time during which cars loaded with hay are left standing on its tracks at a suburban station in Boston after the expiration is within the meaning of interstate commerce, etc.

The court said in the course of its opinion:

"Practically all the charges here in question are made to compensate the railroad for the use of its cars and tracks beyond that reasonable period during which a railroad must allow the consignee to come and get his goods without charge. A railroad is not obliged to permit the use of its cars for storage. It may require consignees to remove their goods at once, but for its own profit and for public convenience the use is permitted, and compensation therefor is exacted. *The railroad directly, and indirectly the public, are benefited by a speedy release of cars, and their speedy return into circulation. This obvious fact is emphasized by the conditions which now exist throughout the United States.* The time allowance for delivery at Forest Hills is reasonable, and the court has already held that the charge made for car service there is reasonable also. The railroad is not bound to build a hay shed at Forest Hills or at its stations generally. At its terminal in the great city of Boston it has done so, and there it gives facilities for storage which are not given at Forest Hills or elsewhere on the line."

In *Rhodes* v. *Iowa*, 170 U. S., 412, in construing a statute of Iowa in connection with a shipment of liquor from Dallas, Ill., destined to Burlington, Iowa, the Supreme Court said:

"That this Iowa statute can not be held to apply to a box of spirituous liquors, shipped by rail from a point in Illinois to a citizen of Iowa at his residence in that state while in transit

from its point of shipment to its delivery to the consignee, without causing the Iowa law to be repugnant to the Constitution of the United States.

"Moving such goods in the station from the platform, on which they are put on arrival, to the freight warehouse is a part of interstate commerce."

The case of *Coe* v. *Errol,* 116 U. S., 517-519, appears among the authorities cited for consideration. There the question was as to what period of time goods prepared for exportation to another state and partially prepared for that purpose by being deposited at a place or port. of shipment within the state, were freed from local taxation.

The court observed that there must be a point of time when they cease to be governed exclusively by the domestic law and begin to be governed by the national law; that they are not in process of exportation, nor is exportation begun until they are committed to the carrier for transportation out of the state.

This might have some bearing upon the question but for the provision of the interstate commerce act. Interstate *transportation* within the meaning of that act has begun when the shipper has called for and had the car delivered to him for loading. That is true because the act provides that transportation includes cars and all services in connection with the receipt, delivery, etc. And the act, as before stated, requires the interstate roads to file and publish the tariff lists for such services. And the submissions upon the demurrer shows that this has actually been done.

Counsel for plaintiffs urge the claim that even the enforcement of the rules in question in *intrastate* commerce will operate upon as an interference with *interstate* commerce. That is perhaps true; increasing free time for the use of cars, when used for service within the state, would have precisely the same effect so far as retarding the progress of the cars as if increased for interstate service. The railroad equipment being a part of one system of transportation, a different rule as to free time for car service from that in interstate would create confusion. If greater time be allowed in domestic service than in national, the supply of cars would be interfered with.

But there seems to be absolutely no way. of avoiding such a result. The state may make reasonable rules regulating *intrastate* service, and if they prove burdensome to *interstate* commerce, there would seem to be no remedy.

The state has the right to the service of interstate railway systems in *intraslate* commerce. Having that right it may also regulate its exercise without fear or hindrance of national interference.

The rules in question are considered invalid only so far as they are made to apply to interstate shipments in the *transportation* by interstate commerce railroads, as defined in the interstate commerce act, and in the manner pointed out in this opinion.

Without further particularization (unless counsel think it necessary) of the rules drawn in question, the demurrer to the second cause of action is overruled for the reasons stated.