# CITY OF ST. PETERSBURG v. ATLANTIC COAST LINE RY. (No. 2).

Railroad & Public Utilities Commission.

July 11 and September 9, 1957.

Erle B. Askew, S. E. Simmons and Carroll R. Runyon, all of St. Petersburg, for petitioner.

Baya M. Harrison, Jr., St. Petersburg, and Charles Cook Howell, Jacksonville, for respondent.

Chairman ALAN S. BOYD and commissioners JERRY W. CARTER and WILBUR C. KING each participated in this matter.

BY THE COMMISSION.

*Order granting motion for disqualification, July 11, 1957:* Respondent Atlantic Coast Line Railroad Co. has filed a motion for disqualification of the members of this commission on the basis of an affidavit of prejudice thereto attached.

By its motion and supporting affidavits, respondent suggests that the members of this commission severally proceed no further herein, and that they enter an appropriate order disqualifying themselves.

The facts and reasons stated as the basis for respondent's belief that each of the commissioners is prejudiced against the Atlantic Coast Line, according to the affidavit of prejudice, arose out of and in connection with the participation and activities of the commissioners, and their legal representatives, in the years 1956 and 1957, in the matter of the reorganization of the Florida East Coast Ry.

*Procedural History*

On May 6, 1954 the city of St. Petersburg filed with this commission a petition complaining of the location and adequacy of the Coast Line's freight and passenger depots in that city. The city's petition, among other things, alleged that the railroad's passenger station is old, unsightly, obsolete, poorly arranged and no longer adequate from the standpoint of the convenience and necessities of the traveling public; that said station constitutes a serious and continuous threat to the public safety and welfare of the city, its inhabitants and visitors by impeding the free and effective movement of fire, police and ambulance traffic; that the railroad's freight station, also in the heart of St. Petersburg's business district, is inadequate in size, location and accessibility and constitutes a menace to the public safety and welfare; and that said passenger and freight depots should be relocated to sites not inimical to the public welfare and safety and in keeping with the public convenience and necessity.

After considerable preliminary legal skirmishing the matter came on for a public hearing in St. Petersburg on October 5, 1954. When the hearing was convened, the commission announced that two primary questions were involved — (1) Should the present freight and passenger stations at St. Petersburg be relocated and replaced at a new location by modern and adequate facilities capable of fully meeting the public convenience and necessity, and (2) Where should such new facilities be located. By order of the commission the October hearing was limited to the first question. At the same time, the commission announced that a determination of the second question would be the subject matter of further hearings if the commission should enter an affirmative order concerning the first question.

Two subsequent hearings were held concerning the first question, one in December 1954, and one in March 1955. Briefs were filed by the parties and oral arguments made before the full commission. Thereafter, on June 30, 1955, the commission found that the passenger station located as it is, under the conditions which exist, is insufficient to meet the requirements of the traveling public and does not provide the necessities or conveniences which the traveling public requires. The commission also found that the freight depot cannot and does not provide for the convenience and necessity of St. Petersburg with its population in excess of 125,000. Accordingly, the commission directed the railroad to remove its freight and passenger depots from their present locations and to construct and operate new, modern, and adequate freight and passenger depots, capable of fully meeting the convenience and necessities of the public, at such location or locations in the city consistent with the public interest, safety, and welfare, as might be determined and directed by the commission pursuant to a further hearing to be held at a time and place subsequently to be announced by the commission.

In due time, the Coast Line attempted, unsuccessfully, to have the commission's order reviewed in the Supreme Court of Florida. A similar attempt to have the order reviewed by the Supreme Court of the United States was also unsuccessful.

In the meantime, the railroad filed a complaint for declaratory relief and injunction against the city in the United States district court for the southern district of Florida, Tampa division. The purpose of the complaint was to permanently enjoin the city from taking any "action that would accomplish the destruction of plaintiff's railroad properties at St. Petersburg except by appropriate legal proceedings that would allow just compensation for their

taking." Had the railroad been successful in its efforts to enjoin the city, there would have been no further hearings by this commission concerning the relocation of the freight and passenger depots. For that reason, the commission granted its request that the commission hold no further hearings in the station matter until after the United States district court had entered its decision in the injunction suit. The railroad, however, was unsuccessful in its bid for an injunction and appealed from the district court to the United States circuit court of appeals. Again, at the railroad's request, the commission withheld further action in the station matter pending final disposition of the appeal. In the circuit court of appeals, the railroad was again unsuccessful and this time it decided against seeking further review in the United States Supreme Court.

The way now seemed clear for the commission to resume its hearings in the freight and passenger stations relocation matter. A date, therefore, was selected, June 10, 1957, for a hearing on the final phase of the matter — where should the new stations be located? When advised that the commission intended to resume hearings in this cause, the railroad's attorney sought a conference with the commission and requested that the individual commissioners voluntarily recuse themselves from further participation in this matter because of their position and activities in the Florida East Coast Ry. reorganization proceedings — wherein the commission opposed the Coast Line in its efforts to acquire the bankrupt F.E.C. The commissioners, insisting upon their complete impartiality in the St. Petersburg matter and lack of prejudice against the Coast Line, refused voluntarily to declare themselves disqualified. Acting on the request of Coast Line's attorney, the commission then set the St. Petersburg hearing for July 1, 1957 rather than June 10, 1957 so that the Coast Line would have sufficient time to undertake formal disqualification of said commissioners, if it so desired. Thereafter, the Coast Line's motion for disqualification was filed on June 18, 1957 — and this commission immediately entered an order indefinitely postponing the hearing previously set for July 1, 1957.

### Statutory Provision for Disqualification

Section 120.09, Florida Statutes 1955, provides that any member of a commission, elected by the people of the state and authorized by the statute to exercise judicial powers, may be disqualified, either voluntarily or involuntarily, from serving in a particular investigation, inquiry, hearing, trial, appeal, matter or thing, on the same grounds, in the same manner and to the same extent as

circuit judges may be disqualified from acting in a judicial capacity. In the event a commissioner is disqualified, the governor is required to appoint a circuit judge to serve temporarily in such pending matter in lieu of the disqualified commissioner. That statute applies to the Railroad & Public Utilities Commission. In fact, it was prepared by the commission's legal department and sponsored by the commission during the 1951 session of the legislature.

Section 38.10, Florida Statutes 1955, provides that whenever a party to any action or proceeding shall make and file an affidavit that he fears that he will not receive a fair trial in the court where the suit is pending on account of the prejudice of the judge of said court against the applicant, or in favor of the adverse party, such judge shall proceed no further in said cause. Every such affidavit must state the facts and the reasons for the belief that any such bias or prejudice exists. The affidavit must be accompanied by a certificate of counsel of record that such affidavit and application are made in good faith, and the facts stated as a basis for making the said affidavit must be supported in substance by affidavit of at least two reputable citizens not of kin to the moving party or counsel for such party.

The affidavit of prejudice, attached to the motion for disqualification herein, states that the facts and reasons relied upon as establishing the supposed prejudices of the commissioners relate to this commission's position and behavior in (1) intervening generally in the F.E.C. reorganization proceedings; (2) the testimony which the commission produced and sponsored; and (3) the brief which it filed with the Interstate Commerce Commission in said proceeding.

*Commission's Intervention in F.E.C. Reorganization Proceeding*

Under date of May 1, 1956, this commission filed with the Interstate Commerce Commission its application for leave to intervene generally in the F.E.C. reorganization proceeding for the purpose of opposing the Atlantic Coast Line plan of reorganization which calls for Coast Line control of the F.E.C. The affiant and the Coast Line take the position that this general intervention is evidence of prejudice against the Coast Line by these commissioners because, according to the Coast Line's interpretation, neither these commissioners nor the Florida commission, are under any obligation, duty or responsibility, or had the power or authority, to thus intervene in the reorganization proceedings, and to contest, and attempt to defeat, the plan of reorganization filed therein by the Atlantic Coast Line.

The action of the commission, and the individual commissioners, in intervening generally in the reorganization matter did not result from nor is it evidence of prejudice against the Atlantic Coast Line. Such intervention was merely an affirmative step in carrying out the commission's duties and obligations to the public — and resulted from a specifically expressed public demand for such action as would help to retain the F.E.C. as an independent railroad.

On February 10, 1956 the Interstate Commerce Commission transmitted to the Governor of this state a copy of the reorganization plan filed with that commission by the Atlantic Coast Line. The letter of transmittal advised the governor that the plan provides for the transfer of the debtor's properties to the Coast Line. On March 3, 1956, the governor acknowledged receipt of the copy of the plan and advised the I.C.C. that the Florida Railroad & Public Utilities Commission is the agency of the state of Florida which is *charged with the responsibility* of taking the public's interest in matters involving transportation and that he was transmitting the proposed plan to said commission for such action as the commissioners might deem proper.

The governing bodies of most cities and towns, counties, port authorities, and chambers of commerce along Florida's east coast adopted and forwarded to this commission formal resolutions requesting the commission to intervene in the reorganization proceedings in the interest of continuing the F.E.C. as an independently owned and operated railroad.

The F.E.C. became insolvent and was thrown into equity receivership more than 25 years ago. In 1941 reorganization proceedings under section 77 of the Bankruptcy Act were substituted for the receivership. For many years the debtor railroad has been very profitably operated — there seems, however, to be no end to the reorganization proceedings. It has long been recognized that the termination of a long standing receivership or reorganization of railroad properties is always a matter of substantial public interest.

Section 360.10, Florida Statutes 1955, provides that no railroad company shall consolidate with any parallel or competing railroad without permission from this commission. Here is a clear legislative intent to vest in this commission jurisdiction over the purchase or acquisition of one railroad's property by another railroad. The conclusion seems inescapable that this commission, insofar as the state of Florida is concerned, is the guardian of the public interest in railroad consolidation and purchase matters.

Most states have similar statutes, and the Supreme Court of the United States in discussing these state restrictions on railroad

purchases and consolidation has said that they represent—" . . . a policy which has not only found a place in the statute law of such states as apprehended evil effects from such consolidations, but has been declared by the courts to be necessary to protect the public from the establishment of monopolies. Indeed, the unanimity with which the states have legislated against the consolidation of competing lines shows that it is not the result of local prejudice, but of a general sentiment that such monopolies are reprehensible." L. & N. R. Co. v. Commonwealth of Kentucky, 161 U.S. 677, 40 L. ed. 849.

The general powers and duties of this commission as set out in section 350.12 of the statutes establish it as the representative of the public interest in railroad transportation matters. The Supreme Court of Florida has time and again recognized this representative capacity of the Florida commission.

This commission then was performing its statutory duty when in response to specifically expressed public demand, it intervened generally in the reorganization matter. Its position in opposing the proposed Atlantic Coast Line plan of reorganization reflected the public interest and the public demand rather than prejudice on the part of these commissioners against the Atlantic Coast Line.

### Florida Commission's Testimony
### In F.E.C. Reorganization Matter

Every plan approved by the I.C.C. for the reorganization of a bankrupt railroad under the provisions of section 77 of the Bankruptcy Act must be compatible with the public interest.

Being the agency of the state of Florida, as stated in the governor's letter of March 3, 1956 to the I.C.C., which is charged with the responsibility of taking the public's interest in transportation matters, it was the duty of this commission, after intervening in the F.E.C. reorganization proceeding, to support with relevant testimony its position that the public interest requires the continued operation of the F.E.C. as an independent railroad. The commission performed that duty to the best of its ability within its limited resources. How well we succeeded in performing this duty is evidenced by the fact, referred to in the affidavit of prejudice, that chairman Alan S. Boyd was invited to appear before the house appropriations committee of the Florida legislature on April 16, 1957 "to explain the intervention at a cost to the state of about $10,000." After the chairman's explanation of the com-

mission's position and activities in the proceeding, the committee expressed its feeling that the "money was well spent."

Among the witnesses produced by the commission at the West Palm Beach hearing in the F.E.C. reorganization proceeding were —Alan S. Boyd, chairman of the Florida commission; John W. Martin, former governor of Florida and now sole trustee of the F.E.C.; A. A. Jackson, assistant to the trustee and administrative supervisor of all departments of the F.E.C.; Verle A. Pope, state senator from St. Johns County; Hubert Hahn, mayor-commissioner of St. Augustine; Francis E. Morrison, mayor-commissioner of Daytona Beach; J. J. Parrish, citrus grower, packer and shipper; Herbert C. Gee, consulting engineer for Port of Palm Beach; Robert H. Gore, newspaper publisher and shipper of Ft. Lauderdale; R. T. Spangler, manager, Port Everglades; Roland A. Smith, acting manager, Miami Traffic Ass'n; Leonard Usina, bank president; James Sottile, Jr., bank president; R. B. Gautier, Jr., state senator, Dade County; John D. Pennekamp, associate editor, Miami Herald; Thomas W. Hagen, editor, Miami Daily News; Alfred Canel, general manager, Miami-Dade County Chamber of Commerce; Daniel M. Pesce, transportation manager, Food Fairs of Florida, Inc.; Frank A. Danahy, traffic manager, Burdine's department store; Jesse Yarborough, chairman board of county commissioners, Dade County; Richard T. Gallion, chairman board of county commissioners, Broward County; Max K. Rhodes, chairman board of county commissioners, Brevard County; Dan F. Mickler, chairman board of county commissioners, St. Johns County; Breece A. McCray, mayor-commissioner, New Smyrna Beach; Ray A. Padgett, mayor, Fort Pierce; Randall Christmas, mayor, city of Miami; E. A. Evans, city manager of Miami; R. J. Healey, traffic manager, Broward County Traffic Ass'n; T. C. Maurer, general traffic manager, National Container Corp.; R. M. Dozier, traffic manager, Deerfield Groves; D. L. Harper, traffic manager, Chase & Company; Clinton R. Scharff, retired traffic director and chairman General Motors Traffic Ass'n; and several other public officers, chamber of commerce officials, independent shippers and receivers of freight from the territory served by the Florida East Coast Railroad, and several supervising officials and operating employees of said railroad.

The production of voluntary witnesses of this character with such widespread interests and geographical distribution is not evidence of the commissioners' prejudice against the Atlantic Coast Line—on the contrary, it is compelling evidence of tremendous public interest in retaining the Florida East Coast as an independently owned and operated railroad.

## Florida Commission's Brief in
## F.E.C. Reorganization Matter

As charged in the affidavit of prejudice, this commission filed a comprehensive brief in the F.E.C. reorganization proceeding. The affiant takes the position that this brief is evidence of prejudice against the Atlantic Coast Line by the members of the commission.

The brief begins with the statement that—"The interest of the Florida commission in these proceedings is limited to, but is as broad as, the public interest."

The argument contained in the brief is prefaced with this statement—

"It is the considered opinion of the Florida commission, based upon its intimate knowledge of the transportation needs of the affected public in the territory involved, and supported by the record herein, that the current efforts to reorganize the debtor railroad must accomplish three major objectives if the public interest is to be fully recognized and protected.

"Those objectives are—

"*First,* the Florida East Coast must be reorganized and continued as an independent, unaffiliated railroad, completely free of control by any trunk line carrier.

"*Second,* the relocation orders of the Florida commission concerning the Miami passenger station, with the consequent removal of the freight servicing facilities from the debtor's Buena Vista Yard, must be recognized and provided for in the reorganization plan to be approved and certified by the commission.

"*Third,* these proceedings must be brought to a speedy conclusion without the unreasonable delays that have highlighted the debtor's receivership and reorganization history during the past *quarter of a century*.

"It is likewise the considered opinion of the Florida commission, based upon the obvious and normal intention of the equitable owners of the debtor railroad to protect their rights by every legal means available, that these three essential objectives, individually and collectively, can be accomplished only by an internal reorganization which results in the 5% bondholders becoming the stockholders in the reorganization company. Any other plan would be subject inevitably to extended litigation and unreasonable delay.

"The Florida commission, therefore, is not only *willing to support* the bondholders' plan because it is compatible with the public interest, but *must support* that plan because it and no other will accomplish the three objectives required by the public interest."

The brief then goes on to argue that the Florida East Coast is financially a strong railroad, strategically located, with impressive earnings, increasing traffic volume, and improving operating experience, completely capable of operating as a profitable independent line rendering a dependable and efficient transportation service without depriving the public of the many benefits that flow from an independent operation.

The brief likewise contends that continued existence of the debtor as an independent railroad, free of control of *any* trunk line, makes for the ideal situation from the standpoint of competition, and consequently of service, and therefore of the public interest. In this connection the brief calls attention to the testimony of Harry A. Debutts, president of Southern Railway Co., and John W. Smith, president of Seaboard Air Line Railroad Co., that control of the F.E.C. by Coast Line would disrupt the whole balance of competitive forces between the three trunk line railroads at Jacksonville.

In its brief, the commission called attention to testimony in the record that the proposed ACL-FEC merger would adversely affect business expansion along the east coast section of Florida, hamper the future development of Florida's east coast ports, endanger connecting carriers, destroy present competitive conditions and eliminate the open gateway at Jacksonville which is so vital to Florida shippers, and seriously disrupt the economy of dependent cities such as St. Augustine, New Smyrna Beach and Ft. Pierce, where hundreds of F.E.C. employees live and where railroad shops and general and division headquarters are located.

Finally, the commission's brief concluded with the following statement—

"The Florida commission has insisted throughout that there are three primary and essential objectives that must be accomplished by this current effort at reorganization of the Florida East Coast Ry. Co. Any plan to merit approval as being compatible with the public interest must make possible the accomplishment of the following objectives—

"*First,* these proceedings must be brought to a close without the delays and litigation that have become commonplace herein during the past *quarter of a century.*

"*Second,* the debtor must be retained and operated as an independent railroad.

"*Third,* the Miami situation must be solved in conformity with the lawful order of the Florida commission requiring the relocation and modernization of the Miami terminal passenger and freight stations and facilities.

"The plan sponsored by the Atlantic Coast Line Railroad Co. will not, and cannot be made to, accomplish these major and essential objectives and therefore must be deemed to be incompatible with the public interest and should not be approved."

The brief which we filed with the I.C.C. in the reorganization proceeding is not evidence of prejudice against the Atlantic Coast Line. On the contrary, it includes what we believe to be a comprehensive and forceful discussion of the basic reasons why the F.E.C. should be retained as an independent railroad—together with supporting testimony by many outstanding Floridians whose opinions are based on the public's interest and welfare and not on bias and prejudice.

### Sufficiency of Motion and Affidavit of Prejudice

As we have previously stated herein, the law governing the disqualification of circuit judges also governs the disqualification of members of this commission.

The Supreme Court of Florida has been called upon many times to pass upon the disqualification of a trial judge. In State ex rel. La Russa v. Himes, 144 Fla. 145, 197 So. 762, the Court said—

"Fear that he will not have a fair trial may in some cases be a mental attitude but if the conduct of the judge has been such as to create it, the law requires that he recuse himself. It may ultimately be as devoid of reality as the cenotaph is to the remains of the hero it commemorates but if conclusively shown that the seed of fear was planted and the facts related give a reasonable man ground for belief that the judge is prejudiced, that is sufficient."

In State ex rel. Davis v. Parks, 141 Fla. 516, 194 So. 613, the Court said —

"This court is committed to the doctrine that every litigant is entitled to nothing less than the cold neutrality of an im-

partial judge. It is the duty of courts to scrupulously guard this right and to refrain from attempting to exercise jurisdiction in any matter where his qualification to do so is seriously brought in question. The exercise of any other policy tends to discredit the judiciary and shadow the administration of justice."

The Supreme Court has frequently held that a judge may determine the legal sufficiency of affidavits to show disqualifying prejudice, but has no right to pass upon the truth or falsity of the facts alleged therein; neither can he adjudicate the question of his disqualification. If he finds the affidavit legally sufficient, he is left with no alternative but to retire from the cause, as directed by the statute.

Finally, the Court has said —

"When one judge is disqualified, another is immediately substituted, and the cause proceeds in the orderly way. *It is a matter of no concern what judge presides in a particular cause,* but it is a matter of grave concern that justice be administered with dispatch, without fear or favor or the suspicion of such attributes. The outstanding big factor in every lawsuit is the truth of the controversy. Judges, counsel, and rules of procedure are secondary factors designed by the law as instrumentalities to work out and arrive at the truth of the controversy.

"The judiciary cannot be too circumspect, *neither should it be reluctant to retire from a cause* under circumstances that would shake the confidence of litigants in a fair and impartial adjudication of the issues raised."

The affidavit of prejudice in the present case is undoubtedly legally sufficient when measured by the foregoing considerations. We have no right to traverse or deny the allegation of prejudice even though none of these commissioners is conscious of any bias or prejudice against the Atlantic Coast Line or in favor of the city of St. Petersburg and we know that we can complete this proceeding with complete fairness to all parties concerned.

We are not permitted to deny that the Coast Line has a fear that it will not receive a fair and impartial hearing even though we have received and considered 19 applications involving the Coast Line since we intervened in the F.E.C. reorganization proceeding — with no intimation from the Coast Line that it harbored any fears con-

cerning our impartiality. Eleven of these cases were docketed with the commission after the adjournment of the West Palm Beach hearing in the F.E.C. matter. Three were docketed after our brief was filed with the I.C.C. In these 19 cases hearings were held in some and others were disposed of without hearings. In one case the commission on March 22, 1957 denied the relief which the Coast Line sought, and no review of our order has been requested. In 14 of the cases the Coast Line was granted the relief sought in the application. Four of the cases are still pending.

This proceeding involving the relocation of the freight and passenger depots has been pending before the commission since May 6, 1954. Our order requiring the railroad to remove its freight and passenger depots from their present locations to a new location or locations to be determined pursuant to a further hearing to be held at a time and place subsequently to be announced was entered on June 30, 1955. Even though two years have now elapsed since the relocation order was entered, the further hearing has not been held to determine the new location or locations simply because the commission felt the railroad was entitled to complete its litigation against the city in the federal courts before being required to proceed with further hearings in this station relocation matter. Certainly this matter which is of such great importance to the city of St. Petersburg and to the Atlantic Coast Line should not be further delayed by extended litigation over the qualification of these commissioners to proceed.

None of the undersigned commissioners has any desire to sit in judgment in a cause where one of the parties fears that it will not receive a fair and impartial trial. We recognize that it is a matter of no concern what judge or commissioner presides in a particular cause — but it is a matter of grave concern that justice be administered with dispatch, without fear or favor or the suspicion of such attributes.

We hold, therefore, that the affidavit of prejudice and the supporting affidavits are legally sufficient to invoke the statute and that the motion for disqualification should be granted.

It is therefore ordered by the commission, and by each of the individual commissioners, Alan S. Boyd, Jerry W. Carter and Wilbur C. King, that the motion for disqualification of said commissioners, and each of them, be and the same is hereby granted.

It is further ordered that said individual commissioners proceed no further herein and that a certified copy of this order be forwarded immediately to the Honorable LeRoy Collins, Governor of

the State of Florida, for appropriate action under the provisions of the applicable statute.

GEORGE PATTEN, HAROLD B. CROSBY, and HAROLD R. VANN, Circuit Judges.

*Order, September 9, 1957:* On July 11, 1957 chairman Alan S. Boyd and commissioners Jerry W. Carter and Wilbur C. King, as and constituting the Railroad & Public Utilities Commission, entered an order herein disqualifying themselves from further participation in these proceedings on the motion for disqualification filed by respondent Atlantic Coast Line R.R. Co.

Thereafter, on July 19, 1957, the Governor of Florida issued an executive order appointing Circuit Judge George Patten of the eighth judicial circuit, Circuit Judge Harold B. Crosby of the first judicial circuit, and Circuit Judge Harold R. Vann of the eleventh judicial circuit, to serve as members of and constituting the Railroad & Public Utilities Commission in all future proceedings involving this docket.

On July 27, 1957 the city of St. Petersburg, petitioner herein, filed with the commission its petition to take the depositions of the respondent railroad upon written and oral interrogatories. Fifty written interrogatories were set forth in said petition.

On July 31, 1957 the Coast Line filed with the commission its motion for reconsideration of the commission's order of June 30, 1955 wherein respondent was ordered to remove its St. Petersburg freight and passenger depots from their present locations, and, upon such reconsideration, the revocation of said order and the entry of an order denying the petition filed by the city on April 7, 1954.

The commission, composed of the three circuit judges aforesaid, convened at the commission's hearing room in the Whitfield Building, Tallahassee, at 10 A.M., August 27, 1957, pursuant to formal notice for the purpose of disposing of all pending motions and fixing a date for a future hearing, if any, on the merits in this cause. When the commission convened, the respondent filed its written answers to the city's interrogatories 1, 2, 3, 5, 10, 11 and 40. At the same time, respondent filed written objections to the remaining interrogatories.

Having heard oral argument by counsel for the parties on the motion for reconsideration, the petition to take depositions and the written objections thereto, it is ordered that —

1. Respondent's motion for reconsideration is denied.

2. The city's petition to take depositions is granted as to written interrogatories 4, 9, 13, 14, 15, 19, 20, 22, 23, 24, 25, 26, 27, 28, 30, 31, 33, 34, 36, 37, 38, 39, 41 and 43. Written answers to each of said interrogatories shall be filed with the commission, and a copy furnished to the petitioner, on or before October 18, 1957. The petition is denied as to interrogatories 6, 7, 8, 16, 17, 18, 21, 29, 32, 35, 42, 45, 46, 47, 48, 49 and 50. The remaining interrogatories have been answered by the respondent.

3. A pre-hearing conference, pursuant to the provisions of chapter 57-116, Laws of Florida, Acts of 1957, shall be held before the commission at its hearing room, Whitfield Building, Tallahassee, at 10 A.M., November 8, 1957, to consider the following — (a) the simplification of the issues, (b) the necessity or desirability of amendments to the pleadings, and (c) the limitation of the number of expert witnesses. In addition, the parties shall come to the pre-hearing conference prepared to make full disclosure as to the evidence they expect to adduce at the subsequent hearing on the merits. At the same time, the city shall be prepared to submit the proposed new location for the depot facilities involved in this proceeding.

4. A public hearing, without further notice, shall be held by the commission commencing at 10 A.M., December 2, 1957, in the city commission hearing room in St. Petersburg for the purpose of receiving evidence from the parties which will assist the commission in determining where the St. Petersburg passenger and freight stations of the Atlantic Coast Line should be located when removed from their present locations, as directed by the commission in its order #2199, entered on June 30, 1955.

By order of George Patten, circuit judge of the eighth judicial circuit, Harold B. Crosby, circuit judge of the first judicial circuit, and Harold R. Vann, circuit judge of the eleventh judicial circuit, as and constituting the Florida Railroad & Public Utilities Commission.